331 So.2d 443 (1976)
STATE of Louisiana
v.
Eddie GOVERNOR and Henry George Henderson, Jr.
No. 57135.
Supreme Court of Louisiana.
March 29, 1976.
Rehearing Denied May 14, 1976.
*446 Walton J. Barnes, II, Arthur J. Boudreaux, III, Barnes & Barnes, Baton Rouge, for defendants-appellants.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Samuel C. Cashio, Dist. Atty., Charles H. Dameron, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
At approximately eleven o'clock on the morning of August 9, 1974 two black men, armed with a pistol and rifle, entered Morales Grocery Store at Brusly, Louisiana. They forced all of the customers in the establishment at gunpoint to lie face down on the floor and then proceeded to rob the cashier by removing a quantity of money from the cash register. The owner, Addie Morales Crochet, who was in a back office, observed the robbery in progress and came forth with a handgun, firing at the robbers. She then chased them down the street in an effort to apprehend them.
Eddie Governor and Henry George Henderson, Jr., were later apprehended, charged with the crime of armed robbery, tried by a jury, convicted and sentenced to serve fifteen years in the custody of the Department of Corrections without benefit of parole, probation or suspension of sentence.

Assignment No. 1
In a written motion to suppress the lineup conducted on the 9th and 10th of August 1974, it is alleged that, as a result of the lineup, defendants were subjected to "possible" identification by Geneva Seals, Mary Kay Parsons and Addie Morales Crochet. It is further alleged that the lineup procedure violated the rights of defendants because they were not allowed to consult with counsel, they were not allowed to select their place in the lineup, or to examine or object to the use of certain participants in the lineup contrary to normal procedure in the sheriff's office. They allege, moreover, that they were not allowed to examine the witness brought to identify them prior to the lineup examination.
*447 At the outset it should be noted that the lineup identification was not introduced into evidence. The prosecution relied entirely upon the in-court identification. Further, the in-court identification by several witnesses was amply supported by evidence independent of the lineup, and the defense does not seriously contest this fact.
With respect to the contention that defendants were denied the right to counsel, the record reflects that the lineup occurred on the 9th and 10th of August 1974, prior to the filing of a formal affidavit charging them with armed robbery on August 13, 1974 and the filing of the bill of information on August 14, 1974.
In addition, as the facts are understood, both defendants admitted they were advised of their right to counsel immediately upon being taken into custody. They also conceded that they were aware of the fact that they had the right to counsel and they advised the officers at the time of the lineup that they did not need counsel. The trial judge was of the opinion that both defendants waived their right to counsel if, in fact, they had such a right.
A lineup after arrest, but prior to an indictment or formal charge, does not require the presence of counsel because there is no "criminal prosecution" pending. No substantial constitutional or statutory right is violated if counsel is not present at this stage. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); State v. Nero, 319 So.2d 303 (La.1975); State v. Johnson, 306 So.2d 724 (La.1975); State v. Vince, 305 So.2d 916 (La.1974); State v. James, 305 So.2d 514 (La.1974); State v. Jefferson, 284 So.2d 577 (La.1973).
Considering the fact that evidence of the lineup identification was not used at the trial and that there was ample evidence to support in-court identification independent of the lineup identification, no ascertainable deprivation of right or fundamental unfairness resulted from the circumstance that defendants were not allowed to select their places in the lineup, or examine, or object to the use of, certain participants. Nor do they have a right to examine the witnesses brought to identify them prior to the lineup. The motion to suppress was properly denied.

Assignment No. 2
During the voir dire examination of prospective jurors defense counsel moved for a mistrial when Sherman Stewart, a member of the jury venire who, when asked by the trial judge if he had formed an impression or opinion as to the guilt or innocence of the defendants of such an extent that he could not render a fair and impartial verdict, responded that he had formed such an opinion. He further stated that he did not believe the "young lady" (a prosecuting witness) would lie.
At the request of defense counsel the courtroom was then cleared of all prospective jurors. Defense counsel then moved for a mistrial, arguing that Stewart was from the community where the robbery occurred and the other prospective jurors, having heard his declaration, would be unduly influenced. The motion was denied and the ruling was assigned as error. Defense counsel then questioned Stewart, asking if he had talked to any of the other prospective jurors about the case, and Stewart answered in the negative. Stewart was then challenged for cause, and the challenge was granted. The trial judge then admonished the prospective jurors and those selected to disregard anything said by Stewart concerning his opinion of the guilt or innocence of the accused, for those statements were not evidence, and they were to make independent judgments of the case.
Defense counsel argues that Stewart's declarations constituted prejudicial conduct within the meaning of that term as used *448 in Article 775 of the Code of Criminal Procedure which provides:
"Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by article 770 or 771."
The trial judge's careful admonition to the jurors and prospective jurors, to which brief reference has been made, and the granting of the challenge for cause effectively cured whatever harmful effect Stewart's declaration may have had on the other jurors. Furthermore, defense counsel was granted the opportunity to question all other prospective jurors to determine whether they were influenced by Stewart's statement. No prejudice resulted, and defendants were not deprived of a fair trial. State v. Wilson, 240 La. 1087, 127 So.2d 158 (1961). Mistrial is a drastic remedy and is only authorized in specified instances where unnecessary prejudice resulted to the accused. State v. Nicholas, 312 So.2d 856 (La.1975); State v. Whitley, 296 So.2d 820 (La.1974); State v. Kenner, 290 So.2d 299 (La.1974); State v. Clouatre, 262 La. 651, 264 So.2d 595 (1972).

Assignment No. 3
The prospective juror Mayeux, when examined on voir dire, responded that he lived with his wife in Port Allen, West Baton Rouge Parish, "off and on" but that he spent most of his time in Avoyelles Parish working on his farm. He was registered to vote in West Baton Rouge Parish, and had been for ten or twelve years. He also owned property in West Baton Rouge Parish. He was then challenged for cause by the defense on the ground that he was not a resident of West Baton Rouge Parish, the parish where the case was to be tried as required by Article 401 of the Code of Criminal Procedure. The challenge was denied.
Sufficient indicia of residence was shown here to permit this juror to meet the qualification of residence provided by law. This qualification was not destroyed because the juror spent most of his time in an adjoining parish to work his farm. Although he may have resided at his farm to some extent, his principal residence was in West Baton Rouge Parish.

Assignment No. 4
The prospective juror Falcon stated that she would believe the testimony of a police officer in preference to other witnesses in case of a contradiction. Despite these statements, the prospective juror answered that in such a situation she would have to hear all the evidence before she would accept the policeman's testimony. The defense challenge for cause was denied.
We perceive no error in the ruling. When taken as a whole Falcon's testimony on voir dire does not support defendant's contention that she was unduly biased in favor of the State's witness and against defense witnesses. She testified that she knew of no reason why she could not serve fairly and impartially; that she had no preconceived opinions as to the guilt or innocence of the accused; that she had not heard about the case; that she agreed that defendants were innocent until proven guilty and that the State must bear the entire burden of proving guilt of the defendants; that she would not hold it against the defendants if they didn't take the stand or produce any other evidence; and that when all of the evidence was out she would still be able to apply the law that the defendants were innocent until proven guilty regardless of the fact that a police officer may or may not have testified.

Assignment No. 5
Abandoned by the defense.

Assignment Nos. 6 and 7
Asserting the fallibility of perception and memory and the vagaries of eyewitness *449 identification, the defense contends it was error for the trial judge to deny the admission of the result of polygraph tests taken by both defendants, which would tend to exculpate them from criminal liability. Because of its acceptance in some jurisdictions, it is argued that a deprivation of due process occurs when the Louisiana courts deny admissibility of polygraph tests. The trial judge refused to admit the results of the tests, because no cross-examination was available to the State while the tests were being conducted and because the State would not be permitted to enter such a test into evidence had defendants failed it. He also relied upon State v. Corbin, 285 So.2d 234 (La.1973).
Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value can be admitted. The arguments against admissibility are the lack of standardization in lie detector tests, lack of probative value and insufficient scientific reliability, as well as the possible unduly prejudicial effect upon the jury and an invasion of the jury function. A majority of American jurisdictions exclude this type of evidence for these reasons. See McCormick on Evidence, § 207 (2d ed. 1972); Annotation, Physiological and Psychological Truth and Deception Tests, 23 A.L.R.2d 1306 (1952) and later cases in supplement; 22A C.J.S. Criminal Law § 645(2); 32 C.J.S. Evidence § 588(4); 29 Am.Jur.2d, Evidence § 831. The considerable degree of fallibility in polygraph testing is discussed in Skolnick, Scientific Theory and Scientific Evidence; An Analysis of Lie Detection, 70 Yale L.J. 694, 724-28 (1961).
In State v. Corbin, 285 So.2d 234 (La.1973) where a stipulation was entered into between the defense and the State in which they agreed to appoint a polygraph operator to test all witnesses, the trial court nevertheless refused to do so. We upheld this ruling upon the authority of the majority rule in American jurisdictions which find these tests to be unreliable and fallible and because they had an unduly prejudicial effect upon the jury, infringing upon its function.
Defense counsel has undertaken an impressive research into the problem of polygraph testing, but the only reference to the record in support of this assignment of error pertains to the testimony of a psychologist relating to the ability of the mind to receive and store visual information.
We are referred to no evidence to establish the qualifications of the polygraphist, whether these tests are accepted in his profession, or that the tests have a reasonable measure of precision. Without a more substantial showing of the reliability and probative value of these tests, they are unacceptable as evidence in this criminal prosecution.

Assignment No. 8
Two contentions are made in connection with this assignment of error based upon a ruling of the trial judge permitting the State to impeach two of its witnesses on the ground of surprise. First, it is said that surprise was not shown, and, secondly, it is argued that the proper foundation was not laid to impeach the credibility of the State's two witnesses, Eddie Tobias and Phillip Williams, Jr.
In his opening statement the State's attorney included remarks to the effect that he would prove that two people had seen these defendants, shortly before the robbery, driving one of the accused's automobiles and that they had turned left in the direction of the store where the robbery had occurred.
When Tobias and Phillips were called to testify to this effect, they testified that they did see a car similar to the one owned by defendant Henderson but they could not identify who or how many people were in it, nor could they say which way the car *450 turned. Their earlier statement to Officer Hebert, upon which the State was relying, was to the effect that they saw defendants in the car, described the car, and stated that it turned left, the direction of the Morales Grocery where the robbery occurred.
One can impeach his own witness when he is taken by surprise by the witness' testimony, and the impeachment in such a case is limited to prior contradictory statements. La.R.S. 15:487. Surprise in the sense of this rule does not arise out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side. La.R.S. 15:488.
Under the circumstances the prosecutor justifiably believed that the witness would testify in accordance with their statements to Officer Hebert and not, as the witnesses did, against the State in a matter as material as the identification and presence of the defendants at a place which would show their capability of committing the robbery. State v. Spotville, 308 So.2d 763 (La.1975).
The other issue presented by this assignment of error, as already noted, is whether the State established a proper foundation or predicate to impeach the credibility of the State's two witnesses Tobias and Williams. Section 493 of Title 15 of the Revised Statutes recites the rule applicable to the necessary foundation for proof of contradictory statements in these terms:
"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he had made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible."
It is manifest from the terms of the statute that it is designed to allow the witness a chance to explain the alleged discrepancies in his two statements. As noted in State v. Caldwell, 251 La. 780, 206 So.2d 492 (1968), Section 493
". . . does not envision every detail of the incident should be directed to the witness, it merely requires that his attention be called to the time, place and circumstance, so that there may be `. . . no possibility of his mistaking the conflicting statement referred to, and which he is charged with having made. . . .'"
See also, State v. Bueche, 243 La. 160, 142 So.2d 381 (1962); School Board of Union Parish v. Trimble, 33 La.Ann. 1073 (1881).
A review of the prosecutor's examination of the witnesses in establishing the required foundation convinces us that there was compliance with the intent and spirit of Section 493. Undoubtedly the witnesses were aware of the circumstances, time and place of the prior statement, for they admitted making the statement to Officer Hebert. The disagreement revolved around the content of the prior statement.
There is no substance to this assignment.

Assignment No. 9
As the narrative of facts in the beginning of this opinion discloses, the robbers made the customers lie on the floor while the robbery was in progress. The cashier, Mary Kay Parson, was a young girl on a summer job.
During the course of his rebuttal argument to the jury the prosecutor said "think about the rights of Mrs. Thibodeaux and those customers who were forced to lie *451 down like a puppy dog, like a puppy dog in a commonin a public place."
The contention that this argument by the State's attorney is improper is not well-founded, for it was based upon a reasonable interpretation of the evidence. The law of this State defining the scope of argument is found in Article 774 of the Code of Criminal Procedure:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
"The argument shall not appeal to prejudice.
"The state's rebuttal shall be confined to answering the argument of the defendant."
As his rebuttal argument continued, the prosecutor said:
". . . let's quit thinking a whole lot about the rights of the accused and balance it just a little bit with the rights of these people and the rights of the public to be secure in their person and in their businesses and without having to lie on the floor like a bunch of puppy dogs. And when you have come to your conclusion, if it is guilty, then I say have the courage to come in and render a verdict which will at least set an example and say, well, you can't do it with impunity, at least not in this parish."
In this trial, as in all criminal trials, repeated reference by the defense to the rights of the accused is brought to the jury's attention. The judge charges the jury on that subject. When the prosecutor's argument is read as a whole it is noted that he too gave detailed reference to the rights of the accused, stating that he favored observance of those rights. Under these circumstances it can hardly be said that the reference to the rights of victims to crimes is irrelevant and beyond the scope of argument. The prosecutor must be free, as defense counsel is, to present arguments with logical force and vigor. He has not transcended those bounds here.

Assignment No. 10
A number of special charges to the jury were requested by the defense. The trial judge agreed to give all but the 4th, 5th and 6th charges.
Although these requested charges are not contained in the record and the trial judge's per curiam informed defense counsel that he was unable to prepare a per curiam on this assignment of error unless the charges were furnished, the defense brief quotes what is represented to be the charges the judge refused to give. Since these representations are not contested by the State's attorney they will be considered.

Fourth Requested Charge
"What a person perceives and what a person remembers depends to a great extent upon what is already in that person's mind."

Fifth Requested Charge
"Suggestions in many forms may create an impression in the mind which makes one truly believe the mistaken observation. This suggestion may arise at a biased pre-trial line-up or confrontation, or unintentionally in the witnesses' own mind."

Sixth Requested Charge
"Experimental psychologists agree that perception depends to a great extent on what is already in the mind of the perceiver; one learns to perceive selectively. . . .
"These findings suggest that once a witness' report has been changed according to some minimum inducement and subtle pressure, self-persuasion regarding the truth of statements is likely to *452 occur, and be difficult, if not impossible to rectify . . . .
"Many current police techniques regarding the handling of both suspect interrogation and lineup identification reflect, perhaps unknowingly, a highly sophisticated application of the various psychological principles outlined above. . .
"These widespread practices on the part of police suggest a shrewd, pragmatic grasp of the dynamics of suggestion. This situation raises two issues for the criminal justice system: whether police practices which utilize principles of suggestibility result in correct identifications, and whether these methods are consistent with societal norms of justice even if the resulting identifications are correct . . . ."
Defense counsel argues that this trial was hotly contested and the question of identification was crucial. Throughout the trial the defense attempted to present to the jury evidence and testimony relative to the vagaries of the eyewitness identifications made by the witnesses. The accuracy of their testimony was explored on cross-examination. He asserts that the sixth charge is a quote from United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and is therefore a correct statement of the law.
The State's answer to these contentions is to refer the Court to the general charges of the trial judge on the accuracy of eyewitness identification which are quoted herewith:
"However, just as you must evaluate the evidence in light of your own common experience you must understand that human beings share one universal characteristicthat of fallibility; there are no absolutes.
"One of the foremost hinderances to perfection of your judicial system is that of unintentional mistaken identity of the accused by an eyewitness to the crime. This is not to say that the identification is not felt to be an honest one, or one founded on the vindictiveness of the victim or witness to the crime. We as sensitive human beings are above that. It is simply an honestly made mistake of dire consequences."
These charges fairly and adequately cover the subject of the requested charges which were denied. These instructions were sufficient to instruct the jury on the law so that it could apply this law to the evidence. A requested charge need not be given if it is included in the general charge or in another special charge to be given. La.Code Crim.P. Art. 807; State v. Bastida, 310 So.2d 629 (La.1975); State v. Williams, 310 So.2d 528 (La.1975).

Assignment No. 11
When the jury retired after the case was submitted, the jury foreman returned into court after 55 minutes and informed the trial judge that the jury could not agree on a verdict, because some of the jurors were set in their ways. The judge advised him that "You'll just have to sit for a while and keep deliberating." Whereupon the jury foreman asked, "Suppose still and all, they still don't want to change any opinions?" The trial judge replied: "This is too quick for me to declare a mistrial. That is what I'd have to declare. I can't declare one in fifty-five minutes." At this point defense counsel moved for a mistrial which was denied. Almost two hours later the jury returned guilty verdicts.
As the defense argument is understood, the judge's remarks were coercive and tended to impose upon the jury a demand for a verdict regardless of their individual convictions.
The trial judge did not inform the jury foreman that he would not accept a mistrial. He simply urged the foreman to inform the jurors that they should continue their deliberations because they had only been out 55 minutes.
*453 It is safe to state as a settled proposition that when the Court is informed by a jury that they cannot agree, it is not error for the Court to impress upon them the importance of the case, urge them to come to an agreement, and send them back for further deliberation; for the question of the discharge of the jury because of inability to agree on a verdict is within the sound discretion of the trial judge, and the exercise of that discretion will not be set aside in the absence of palpable abuse. State v. Rodman, 208 La. 523, 23 So.2d 204 (1945); State v. Seals, 135 La. 602, 65 So. 756 (1914); State v. Fuselier, 51 La.Ann. 1317, 26 So. 264 (1899); State v. Dudoussat, 47 La.Ann., 977, 17 So. 685 (1895).
This assignment is without merit.

Assignment No. 12
A verdict of "Guilty" was returned by the jury as to each defendant. However, on the written verdict a notation in pencil appeared below each showing the vote to be 11 for guilty and one for not guilty. Defense counsel objected that, because of the addition of the penciled vote tabulation on the document reciting the verdicts, the verdicts did not conform with the requirement of Article 814 of the Code of Criminal Procedure which prescribes that the responsive verdicts to armed robbery are "Guilty. Guilty of Simple Robbery. Not Guilty."
Although Article 814 does prescribe the quoted verdicts for armed robbery, Article 810 recites that ". . . There is no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury. . . ." And, according to Article 817 "Any qualification of or addition to a verdict of guilty, beyond a specification of the offense as to which the verdict is found, is without effect upon the finding."
This assignment is without merit.

Assignment No. 13
A defense motion for a new trial relies upon some of the errors heretofore considered and found to be without merit. In addition, the motion relies upon newly discovered evidence as a basis for granting a new trial. It is alleged in the motion that Geneva Seals testified at the trial that she had seen the defendants between 9 and 9:30 at Coleman's store in Brusly on the morning of the robbery and that she would not provide that information to the defense before trial. For this reason defense counsel could not prepare a rebuttal to her testimony. Since she testified, however, the defense has ascertained that one Stevens, whose affidavit is attached, is prepared to testify "that sometimes in the past, and during the year 1974" that a real tall Negro male about 20 came to Blanchard's Building Materials in Plaquemine where he worked and asked for some gasoline which he furnished in a milk container.
Accepting the allegations of the motion and Stevens' affidavit as true, we are of the opinion that this evidence, because of its vague and indefinite character, does not establish that an injustice has been done or that, if this evidence had been introduced at the trial, it would have changed the guilty verdict. La.Code Crim.P. art. 851.

Assignment No. 14
A motion in arrest of judgment filed by the defendant presents the question: Is a trial in which women serve on the jury, held prior to January 1, 1975 and the decision in Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), declaring Louisiana's constitutional and statutory prohibitions against service of women on juries to be contrary to the Federal Constitution, conducted in accordance with law? La.Const. art. VII, § 41 (1921); La.Code Crim.P. art. 402.
The answer is contained in three recent decisions of this Court holding that inclusion of women under these circumstances is not improper in view of the subsequent *454 decision in Taylor v. Louisiana. See State v. Gray, 315 So.2d 624 (La.1975); State v. Nicholas, 312 So.2d 856 (La.1975); State v. Milton, 310 So.2d 524 (La.1975).
This assignment has no merit.
For the reasons assigned, the convictions and sentences are affirmed.
CALOGERO, J., concurs.
TATE, J., assigns concurring reasons.
DIXON, J., dissents with reasons.
TATE, Justice (concurring).
The writer is not inclined to reverse the present convictions because, in reliance upon past jurisprudence, the trial court held to be inadmissible the results of polygraph (lie-detector) tests. By them, the defendants are allegedly proved to be telling the truth when they deny any connection with the robbery. The tests would obviously support their defense that they should not be sent to the penitentiary because of the mistaken identification of them by eyewitnesses who saw the actual robbers only briefly.
Nevertheless, in view of the notorious unreliability of eyewitness identification of strangers in circumstances such as the present, questionable to me seems to be our prior judicial characterization of lie-detector tests as incompetent evidence, because of their judicially assumed unreliability. The literature on the subject seems to indicate that, with advances in scientific knowledge, lie-detector tests have at least as high a degree of reliability as eyewitness testimony when conducted by an impartial and skilled expert.
Also, when there are conflicting versions of what actually occurred in a one-on-one situation, in the absence of objective evidence I am inclined to view that lie-detector tests might be at least as competent as trial-demeanor evaluation, to aid the trier of fact in determining which of the opposing witnesses is perjuring himself on the stand.
Sooner or later, it seems to me, the courts will have to accept the competency of lie-detector tests, at least under circumstances of especial need as above suggested. In criminal cases, for instance, the accused should be permitted to take lie-detector tests under controlled situations, with the agreement that whatever results are admissible, and with opportunity for either party to have further tests conducted. (By the Fifth Amendment, however, an accused's failure to consent to the lie-detector tests could not, probably, be referred to.) See 70 Yale Law Journal 725-26 (1961).
The writer therefore notes his reservations as to the judicially established doctrine, rooted in times when the science of polygraphy was younger, that bars under any circumstances the use of this sciencerooted technique as an aid for consideration by the trier of fact in determining truthfulness of a witness.
DIXON, Justice (dissenting).
I respectfully dissent.
The prosecutor's argument to the jury, to the effect that the jury should quit thinking about the rights of the accused and instead think about the victims' rights, was highly improper. "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." American Bar Association Standards for Criminal Justice, Relating to the Prosecution Function, Standard 5.8(d). Predictions as to the consequences of an acquittal on lawlessness in the community go beyond the scope of the issues at trial and are to be avoided. See 54 Colum.L.Rev. 946.
*455 There was no issue in the trial as to the rights of the victims. The criminal justice system exists to protect the people from lawlessness, but the argument of the prosecutor was a clear invitation to the jury to disregard the lawan argument we cannot condone.

On Application For Rehearing
PER CURIAM.
On application for rehearing, the defendants correctly point out that they attempted to introduce foundation evidence to prove the present reliability of polygraph tests. Nevertheless, our decision excluding the polygraph evidence was ultimatey based upon the jurisprudential rule which excludes as inadmissible this type of evidence because of its jurisprudentially determined unreliability. We are unwilling at this time to reconsider this jurisprudential rule.
The other issues raised by the application for rehearing need no further explanation.
The application for rehearing is denied.
DIXON, J., dissents.