368 So.2d 975 (1979)
STATE of Louisiana
v.
Joseph A. CATANESE.
No. 62184.
Supreme Court of Louisiana.
March 5, 1979.
Rehearing Denied April 9, 1979.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Eugene Bryson, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-relator.
M. Daniel LaGrone, Jr., Smith & LaGrone, Shreveport, for defendant-respondent.
DENNIS, Justice.
In this case we are called upon to reconsider this Court's rule excluding for any purpose evidence of a polygraph examination. Our review convinces us that, at present, such evidence should not be admitted in criminal trials. However, the reasons for the exclusion of polygraph evidence during trial do not militate against its introduction, within the trial judge's discretion, in a post-trial proceeding such as a hearing on a motion for a new trial.
Defendant, Joseph A. Catanese, is charged by bill of information with armed robbery. Catanese is prepared to admit that shortly after the crime he picked up and gave an automobile ride to the gunman who committed the robbery. However, the defendant seeks to show by his testimony and the results of a polygraph examination that he was unaware of the robbery and innocent of any involvement in the crime.
The state has consistently objected to the introduction of the polygraph evidence at trial, relying on previous decisions of this Court. After Catanese was denied a pre-trial hearing on his request to introduce evidence of a proposed polygraph examination during trial, he applied to this Court for relief, and we ordered the trial court to hold an evidentiary hearing. 350 So.2d 677 (La.1977). Following a contradictory hearing, the trial judge concluded that, if the *976 polygraph examination were conducted under safeguards prescribed by the court, the testimony of the polygraph expert explaining the test results would be admissible at trial.[1] The State applied here for supervisory review and we brought the case up to consider whether the trial judge's ruling should be reversed or the previous decisions of this Court on the subject should be overruled.
Modern polygraph technique employs an apparatus consisting of scientific instruments *977 which measure and record three or more involuntary physiological responses.[2] The typical polygraph instruments in use today record changes in blood pressure, pulse rate, respiration, and "galvanic skin response"[3] which occur while the subject is being asked carefully prepared questions.[4] Before the test the examiner prepares the questions from information supplied to him by an interview with the subject and by other persons familiar with the subject or the particular case under investigation. The examiner also prepares the subject for the test by explaining to him the theory and measurements involved in the polygraph technique. After the examination the examiner interprets the subject's physiological responses recorded during the test in conjunction with all other information gathered by the examiner, including his careful observation of the subject before and during the examination. Based upon these interpretations and information, the examiner arrives at an opinion as to whether the subject responded truthfully to questions during the test.[5]
The theory underlying polygraph technique is based on several propositions concerning human psychology and physiology: The autonomic nervous system normally responds involuntarily to stress. An individual who is deceptive when questioned about a meaningful subject will experience stress. The polygraph apparatus is capable of accurately *978 detecting the involuntary responses of the autonomic nervous system which result from stress. If the subject attempts to control his autonomic nervous system, this conscious effort is evident to a competent examiner through observation or analysis.[6]
The first appellate decision on the admissibility of polygraph evidence was Frye v. United States, 54 U.S.App.D.C. 46, 293 F. 1013 (1923). In that case the defendant offered the testimony of an expert witness regarding the results of a systolic blood pressure deception test which had been performed on the defendant. The court of appeals upheld the exclusion of this testimony in the following language:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
"We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." 54 U.S.App.D.C. at 47, 293 F.2d at 1014.
This "general acceptance" test has been rigorously applied by many federal and state courts to exclude evidence of polygraph tests.[7]
In the relatively few cases in which this Court has considered the admissibility of polygraph evidence in criminal trials, the expert's testimony has been excluded by a rationale similar to the Frye "general acceptance" rule. In State v. Refuge, 270 So.2d 842, 844 (La. 1974), for example, this Court noted:
"[T]he universal rule in American jurisdictions is that . . . the results of a lie detector test are inadmissible when offered by either party, either as substantive evidence or as relating to the credibility of a party or a witness. The essential reason is the lack of probative value and insufficient scientific reliability, as well as the possible unduly prejudicial effect upon lay triers of fact."
See also, State v. Whitmore, 353 So.2d 1286 (La.1978); State v. Davis, 351 So.2d 771 (La.1977); State v. Schouest, 351 So.2d 462 (La.1977); State v. Weeks, 345 So.2d 26 (La.1977); State v. Governor, 331 So.2d 443 (La.1976); State v. Corbin, 285 So.2d 234 (La.1973).
The "general acceptance" standard has been the subject of considerable scholarly criticism in recent years.[8] In particular, it *979 has been suggested that the requirement of "general acceptance" is tantamount to a requirement that the validity of the test be susceptible of such demonstration as to enable the trial court to take judicial notice of the fact. Clearly, the criteria used for determining the admissibility of scientific evidence should not require the instant and unquestionable demonstration required for the judicial notice of scientific facts.[9] Other types of scientific evidence have been admitted into evidence under less stringent standards which merely require the evidence to be "an aid to the jury" or "reliable enough to be probative."[10]
Professor McCormick and others have suggested that there should be no special rule for the admissibility of polygraphic evidence. C. McCormick, Evidence, § 203 (2d ed. 1972); Trautman, Logical or Legal Relevancy  A Conflict in Theory, 5 Vand.L.Rev. 385, 395 (1952). Instead, these scholars would submit the evidence in each case to a balancing process. Any relevant conclusions supported by a qualified expert witness would be received unless there were other reasons weighing more heavily in favor of its exclusion. The probative value of the evidence in each case would be balanced against reasons for its exclusion, such as the familiar dangers of prejudicing or misleading the jury and undue consumption of time, to determine the question of admissibility.[11]
Recent jurisprudence has also made significant inroads into the "general acceptance" standard. Many jurisdictions now admit polygraph evidence upon prior stipulation of the parties,[12] and a number of *980 recent cases have stated that polygraph test results would be admissible without stipulation and over objection of opposing counsel under a lesser standard than "general acceptance."[13]
We agree that the "general acceptance" standard of Frye is an unjustifiable obstacle to the admission of polygraph test results. In the present case defendant's expert witnesses testified that the modern polygraph examination achieves a high degree of accuracy when conducted by well qualified examiners under proper test conditions. The trial court record supports much of the literature which we have examined that is critical of the restrictive "general acceptance" standard and urges a meaningful reexamination of the admissibility of polygraph evidence.[14] Since Frye was decided in 1923, law enforcement agencies and private industry have come to rely heavily on polygraph examinations for investigation of misconduct and for employment screening;[15] a national association of examiners, the American Polygraph Association, has been established for the purpose of formulating qualifications and ethical standards for polygraph examiners;[16] and many states have enacted statutes for regulating and licensing examiners.[17] Although the *981 validity of the polygraph technique is not universally accepted within the scientific community,[18] it appears that polygraph evidence when obtained under proper safeguards is as reliable as other kinds of scientific evidence accepted routinely by courts.
Nevertheless, after considering the evidence in the instant case and studying the authorities and extensive literature in the field, we conclude that it shall be the judicial policy of Louisiana to exclude polygraph evidence in criminal trials at this time. In doing so, we do not rely upon the "general acceptance" standard which has barred admissibility in the past. Instead, we reach this conclusion after carefully considering the arguments for and against the introduction of polygraph evidence. We recognize the high probative value of polygraph evidence when obtained under optimal conditions. However, after engaging in a balancing process at the appellate level similar to that recommended by McCormick and other writers, we conclude that at present in our court system the probative value is so outweighed by the reasons for its exclusion that the evidence should not be admitted in criminal trials.[19]
The principal reasons for exclusion are interrelated: (1) Our fundamental concern is that the trier of fact is apt to give almost conclusive weight to the polygraph expert's opinion.[20] Many decisions in other jurisdictions seem to rest upon a judicial estimate of the tremendous weight which a polygraph test would have in the minds of a jury. See, e. g., United States v. Alexander, 526 F.2d 161, 168-170 (8th Cir. 1975); People v. Barbara, 400 Mich. 352, 255 N.W.2d 171 (1977); People v. Leone, 25 N.Y.2d 511, 307 N.Y.S.2d 430, 255 N.E.2d 696 (1969); People v. Davis, 343 Mich. 348, 72 N.W.2d 269 (1955); State v. Smith, 113 Ohio App. 461, 178 N.E.2d 605 (1960). Our own appellate experience with P.E.I. tests and other scientific evidence reflects a concern over the apparent readiness of both juries and trial judges to accept such evidence uncritically. See, State v. Graham, 360 So.2d 853 (La.1978); State v. Monroe, 345 So.2d 1185 (La.1977); State v. Jones, 316 So.2d 100 (La.1975). (2) Because of the potentially decisive character of polygraph *982 evidence, we are equally concerned about the quality of such evidence available in Louisiana. The polygraph technique is capable of a high degree of accuracy only when conducted under controlled conditions by an examiner who is highly qualified by his ability, experience, education and integrity.[21] At present Louisiana has no law providing for the licensing, regulating and disciplining of polygraph operators. Although this Court could adopt rules establishing minimum qualifications for expert polygraph witnesses, it could not effectively regulate or discipline them. The record in the instant case does not reflect the number of examiners available in Louisiana or the extent of their qualifications. If polygraph evidence were admissible in criminal trials, highly qualified experts might not be readily available to both defense and prosecution in every case. Thus, introduction of polygraph evidence in criminal trials would entrust key participation in the fact-finding process to persons not presently subject to effective judicial, legislative or adversary control. (3) Even if litigants were afforded an adequate supply of highly qualified experts, extensive procedural safeguards should be established either by court rule or legislation before the introduction of polygraph tests at trial. Otherwise, there is apt to be either an inadequate check upon the quality of the evidence or an undue consumption of time involved in its introduction. Clarification is needed as to the nature of polygraph evidence and the purposes for which it may be introduced, as well as a determination of the type and number of witnesses whose tests may be considered in a criminal case. In our judgment there has not yet been enough judicial experience with polygraph evidence in Louisiana to provide an adequate basis for judicial rule making on this scale.
The reasons for the exclusion of polygraph evidence from criminal trials do not necessarily prevent its use in all criminal proceedings. The polygraph technique has advanced to the point that it could be extremely valuable in criminal proceedings provided its admissibility is carefully limited to specific circumstances designed to insure the validity of the evidence and the proper administration of criminal justice. See, Commonwealth v. A Juvenile, 365 Mass. 421, 313 N.E.2d 120, 124 (1974). A number of courts have attempted to avoid the problems inherent in the use of polygraph evidence by limiting its admissibility to certain types of proceedings. The Michigan Supreme Court held that polygraph evidence, while inadmissible at trial, would be admitted in a hearing upon a motion for a new trial. People v. Barbara, 400 Mich. 352, 255 N.W.2d 171 (1977). Polygraph test results have been admitted into evidence in a number of preliminary and post-trial criminal proceedings. See, State v. Jones, 110 Ariz. 546, 521 P.2d 978 (1974); State v. Watson, 115 N.J.Super. 213, 278 A.2d 543 (1971) (sentencing hearing); People v. Gerry, Cal.Super.Ct. (February 27, 1975) (discussed in N. Ansley, Admissibility of Polygraph Evidence in Criminal and Civil Cases (1978)) (probation hearing); People v. Cutler, No. A176965 (Super.Ct. Los Angeles County, Cal., November 6, 1972), 12 Crim.L. Rptr. 2133 (1972) (motion to suppress). See also, United States v. Ridling, 350 F.Supp. 90 (D.C.Mich.1972), in which admissibility of polygraph evidence was limited to perjury trials.
Although we conclude that polygraph evidence is inadmissible in criminal trials, the reasons for our decision do not prevent its introduction in post trial proceedings, within judicial discretion and subject to guidelines such as those laid down by the trial judge in the instant case. Because the defendant's *983 guilt or innocence is not at issue in such proceedings, there is less demand for the rigorous guarantees of accuracy which typify the rules governing introduction of evidence at trial. Consequently, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post trial proceedings. This avenue of admissibility, therefore, should be open, within the discretion of the trial judge, whenever the evidence is reliable and will aid in a decision. Moreover, the experience gained in this way will perhaps facilitate a more informed conclusion on the question of admissibility of polygraph results in criminal trials.
The capable trial judge in the instant case is to be commended for his very responsible approach toward solving a difficult problem. Had the question arisen in connection with a post trial proceeding we would not hesitate to affirm his decision. However, for the reasons assigned we have concluded that at this time the probative value of polygraph evidence in criminal trials generally is outweighed too heavily by its accompanying dangers. The judgment of the trial court declaring the proposed polygraph evidence admissible is reversed and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SUMMERS, C. J., I agree with the reversal of the ruling of the trial judge, otherwise, I dissent.
TATE, J., assigns, reasons, concurring in part, dissenting in part.
MARCUS, J., concurs and assigns reasons.
BLANCHE, J., not participating.
TATE, Justice (concurring in part, dissenting in part).
The majority's scholarly and comprehensive opinion has held that polygraph examinations should not be admissible in criminal jury trials. Under current conditions, it is difficult to disagree with this conclusion.
The unexpressed major premise for the result is that whatever the reliability of such scientific evidence under controlled conditions in affording polygraph tests they are subject to abuse in criminal jury trials, because of the undue weight we Americans tend to give to "scientific" demonstrations of supposed objectivity, and because, in the present state of the administration of criminal justice, the use of such polygraph tests is subject to great abuse and is without adequate protection for the criminally accused as to the test being conducted in a truly reliable manner.
Nevertheless, I respectfully suggest that these considerations, however much they suggest the need for protective judicial mechanisms in the use of polygraph examinations, do not themselves furnish an adequate reason why the courts should reject the use of the results of the polygraph examination as in principle inadmissible because of their unreliability. Their widespread use in industry and in government are indicative that, although their use may be distasteful, their reliability is not. The courts should not refuse the admission of this type of evidence on the non-existent basis of its unreliability, when the real reason is our failure as yet to devise adequate protective mechanisms to assure the reliability and fairness of the testing conducted insofar as its being used in jury trials in criminal courts.
The chief difference in the viewpoint thus expressed is that I would not adopt any per se rule of inadmissibility of a polygraph examination (based on their supposed unreliability) although I might suggest very strict safeguards, including adequate counselled consent of an accused and strict monitoring of the conditions of the test, before it could be used. Especially in jury trials, it would seem to me appropriate to apply these safeguards strictly and also to weigh whether the probative value of the test was appropriate as to a particular issue (e. g., one-on-one contradictions), so as to outweigh the possible jury prejudice involved in the use of this type of evidence.
*984 Further, it seems to me that unquestionably polygraph tests would be admissible in pre-trial proceedings (as well as post-trial, as suggested by the majority). For instance, too often in motion to suppress situations we have a direct contradiction between the testimony of the accused and the testimony of the searching and arresting officer, which swearing matches to my mind might be more satisfactorily resolved with the aid of polygraph examinations than by judgment calls as to which of two apparently equally credible versions is true.
Furthermore, once we lay aside the unreliability rationale, there seems to be absolutely no sensible reason to exclude the results of polygraph tests conducted under reliable circumstances, with the stipulation of both the state and the defendant that the results of the test can be admitted in evidence on the trial on the merits.
Finally, we may fear state abuse, if polygraph examinations became a customary method of police interrogation (just as pre-Miranda police interrogation, with inadequate safeguards to the accused, often led to unreliable confessions, in the place of adequate investigation through interrogation of other witnesses and collection of objective evidence). Whatever the merit of such fears, I am concerned that a per se rule prevents the accused from using a reliable source of evidence which may prove his innocence. If the use of polygraph data is found to be sufficiently reliable in so many of the other social institutions of our society, the courts should not bar their doors, for essentially arbitrary reasons, to the use by an accused of a form of evidence of a great degree of reliability (if the testing is conducted under properly controlled conditions).
MARCUS, Justice (concurring).
I concur in the adherence to the well-settled jurisprudence of this state holding that the results of the polygraph examination are inadmissible as evidence in criminal prosecutions. State v. Schouest, 351 So.2d 462 (La.1977); State v. Governor, 331 So.2d 443 (La.1976); State v. Corbin, 285 So.2d 234 (La.1973). This would include, in my opinion, introduction of said evidence in "post-trial proceedings." I therefore disagree with the majority's statement that polygraph evidence may be introduced in post-trial proceedings, within the discretion and subject to guidelines such as those laid down by the trial judge in the instant case. Since this case has not yet been tried, this issue is not before us at this time. Accordingly, I concur in the decree.
NOTES
[1] In his opinion authorizing the defendant to lay a foundation for the introduction of the results of a polygraph examination, the trial judge ruled as follows:

"We, therefore, establish the following eleven points as necessary prerequisites for a sufficient foundation to allow the result of the polygraph examination in this case into evidence:
I. A competent examiner. Obviously, this is the heart of the examination. We believe the examiner should be trained to use and analyze the results of a polygraph; that he be current in the field; that he have a baccalaureate degree or the judge be satisfied that he has equivalent experience and literacy, a working knowledge of psychology; at least two years experience in administering tests with the device, the ability to recognize a defective machine, and, furthermore, that his integrity be above reproach. While we would exercise extreme care in this area, surely these standards are no more than we would want from an expert in any field.
II. A calibrated machine. III. A subject relaxed to the extent that the test is valid. Unfortunately, this phrase seems to fall back upon itself for a definition. We must simply be convinced that the subject was sufficiently still and relaxed under the stress of the examination to allow definitive reactions.
IV. A competent pre-test interview. Emphasis must be on the individual's current medical circumstances to include the psychiatric with no real problems indicated as well as a full explanation of the machine, its functions, and a review of the questions to be asked.
V. A meaningful area of inquiry involved. The subject matter must be significant to the person examined.
VI. One question, at least, that threatens the well-being of the subject and precludes the rationalization of the answer. The questions going to the heart of the matter must be worded in such a way as to eliminate possible rationalization by the subject.
VII. At least one control question in the technique. A question establishing a significant reaction level.
VIII. Short Answers. (preferably `yes' or `no').
IX. A low-key, quiet approach by the examiner throughout.
X. At least two charts with proper labeling and responses to include technical notations as to machine settings, devices used, locations of devices on the subject, identity of the point of question on the chart and point of response. Significant proper attempts to resolve apparent positive responses to meaningful questions are necessary. These responses are to be valid throughout. There can be no unresolved responses to the question such that one question has received a positive reaction on two occasions, but not on two others; or positive on three and negative on two, etc. As the witnesses explained, where there is an indication of response to a question on the first occasion, then a second chart is essential to be certain that a response to that question is received on the second occasion. If no response is received on the second chart, then the question is asked a third time. If no response is received again, then the question is determined to be without response. If response is received on this occasion, then proper attempts to resolve the response are to be made and the question asked still again. Thus, it must be apparent from the charts that there is no unresolved area of inquiry, such that the number of responses and non-responses to the same question are not of the same general frequency. However, a positive and then two consecutive negatives are considered negative and vice versa.
XI. The charts made available to the other side sufficiently in advance of the trial. Obviously, this for analysis by any experts they may wish, who may testify if they can be qualified under Point I. Also, we would allow the other side to request a psychiatric evaluation of the testee if they can lay a sufficient foundation to indicate the potentiality that the test was influenced by the testee's mental condition or state of mind, either willfully or inadvertently. As previously discussed, we believe there are slim possibilities in this regard, and we would be critical in evaluating a motion to test the subject.
"We believe that if these criteria are met before the admission of the polygraph examination, the test will have sufficient probative value and be sufficiently valid to assist us or whoever may be trial judge in this cause in the resolution of the issues. Of course, we have the responsibility to evaluate the test in the same fashion that we would evaluate any other scientific evidence, including the strength of the responses and the competence of the examiner as compared with the other evidence in the case."
[2] A. Moenssens, R. Moses, & F. Inbau, Scientific Evidence in Criminal Cases, 539-564 (1973); J. Reid & F. Inbau, Truth & Deception (2d ed. 1977) [hereinafter cited as Truth & Deception); Abrams, Polygraphy Today, 3 J.Crim.Def. 85, 97-98 (1977); Axelrod, The Use of Lie Detectors by Criminal Defense Attorneys, 3 J.Crim. Def. 107, 113-123 (1977).
[3] "Galvanic skin response" is the reduction in resistance to electricity related to an increase in perspiration. This response is measured by electrodes attached to two of the subject's fingers. For a discussion of the "galvanic skin response" and charts demonstrating its use, see Truth & Deception, supra, note 2, at 275-292.

In addition to the four involuntary responses listed in the text, some polygraph apparatus in use today also measure muscular movements in the arm and subtle variations in the heart beat. For a discussion of these and other recent developments in polygraph instrumentation and technique, see articles collected in Legal Admissibility of the Polygraph, 257-288 (ed. N. Ansley 1975).
[4] The subject is asked a series of irrelevant questions, "control" questions, and relevant questions. The irrelevant questions are asked to obtain a "baseline" reading and to neutralize a response before proceeding to a relevant question. The control questions generally ask the subject if he has ever performed a related, but much less serious offense. (For example, a subject accused of robbery may be asked if he has ever stolen anything. The subject is expected to give an untruthful or evasive answer to the control questions. This aids the examiner in determining that the individual is a proper subject for testing, and additionally provides a gauge for measuring the subject's response to the relevant questions. The relevant questions concern the real issue under investigation. They express the accusation itself.

The irrelevant, control, and relevant questions are carefully arranged in a series of no more than about ten questions. All questions are precisely drafted so that the response sought can not be misinterpreted or misconstrued by the subject, and the questions are formulated to require a short answer so that the subject's breathing pattern will not be affected by speech. The questions are delivered in an unemotional monotone so as not to influence the subject's response. The prepared list of questions is read to the defendant in the same order at least twice.
The preparation and use of test questions is discussed in Truth & Deception, supra, note 2, at 24-32; A. Moenssens, R. Moses, & F. Inbau, Scientific Evidence in Criminal Cases, 543-551 (1975); Abrams, Polygraphy Today, 3 J.Crim. Def. 85, 97-104 (1977).
[5] While the opinion of the examiner is based on the objective readings of the polygraph apparatus, we recognize that the examiner is inevitably influenced by subjective factors. See, e. g., Axelrod, The Use of Lie Detectors by Criminal Defense Attorneys, 3 J.Crim.Def. 107, 115 (1977):

"The purpose of administering a lie detector test is for the operator to come to a conclusion that the subject either is or is not lying when claiming not to have committed the crime of which he is accused. The conclusion is not wholly based on the measured and recorded physiological variations, but includes the operator's subjective interpretation of the subject's attitude toward the examination in general and to particular questions. Although Reid instructs the operator to be noncommittal and completely objective throughout the entire examination, he indicates at almost every point what a `lying' subject (as opposed to a `truthful' one) is supposed to do or say."
[6] For a more complete statement of the theory upon which polygraph is based, see, R. Ferguson & A. Miller, The Polygraph in Court, 143-318 (1973); Abrams, Polygraphy Today, 3 J.Crim.Def. 85, 97-98 (1977); Axelrod, The Use of Lie Detectors by Criminal Defense Attorneys, 3 J.Crim.Def. 107, 109-137 (1977); Tarlow, Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System, 2 Hastings L.J. 917, 921-22 (1975) [hereinafter cited as Tarlow].

Polygraph theory recognizes that there is no physiological response to deception per se. Rather, it is believed that certain physiological responses are indicative of the stress which accompanies the attempt to deceive. See, Note, The Emergence of the Polygraph at Trial, 73 Col.L.Rev. 1120, 1137 (1973).
[7] See, e. g., United States v. Salazar-Gaeta, 447 F.2d 468 (9th Cir. 1971); United States v. Rodgers, 419 F.2d 1315 (10th Cir. 1969); United States v. Tremont, 351 F.2d 144 (6th Cir. 1965); Tyler v. United States, 90 U.S.App.D.C. 2, 193 F.2d 24 (1952); People v. York, 174 Cal.App.2d 305, 344 P.2d 811 (1959); People v. Becker, 300 Mich. 562, 2 N.W.2d 503 (1942); Hawkins v. State, 222 Miss. 753, 77 So.2d 263 (1955); Commonwealth ex rel. Hunter v. Banmiller, 194 Pa.Super. 448, 169 A.2d 347 (1961); Davis v. State, 165 Tex.Cr.R. 456, 308 S.W.2d 880 (1958).
[8] See, e. g., Truth & Deception, supra, note 2, at 310-321; Moenssens, Polygraph Test Results Meet Standards for Admissibility as Evidence, in Legal Admissibility of the Polygraph, 14 (N. Ansley ed. 1975); J. Strong, Questions Affecting the Admissibility of Scientific Evidence, 1970 U.Ill.L.F. 1, 9-14; Tarlow, supra, note 6, at 937-946; Trautman, Logical or Legal Relevancy A Conflict in Theory, 5 Vand.L. Rev. 385, 395-98 (1952); Comment, The Emergence of the Polygraph at Trial, 73 Col.L.Rev. 1120, 1136-1141 (1973); Comment, How Some Courts Have Learned to Stop Worrying and Love the Polygraph, 5 N.C.L.Rev. 900, 903-906 (1973); Note, 2 Det.Col.L.Rev. 347 (1978); Note, 48 N.Y.U.L.Rev. 339, 341-45 (1973); See also, discussion and authorities cited in United States v. Ridling, 350 F.Supp. 90 (E.D.Mich. 1972); United States v. DeBetham, 348 F.Supp. 1377 (S.D.Cal.1972); People v. Barbara, 400 Mich. 352, 255 N.W.2d 171, 182 (1977).
[9] See, C. McCormick, Evidence, § 203, p. 491 (2d ed. 1972); Kaplan, The Lie Detector: An Analysis of its Place in the Law of Evidence, 10 Wayne L.Rev. 381, 386 (1964); Strong, Questions Affecting the Admissibility of Scientific Evidence, 1970 U.Ill.L.F. 1, 9-14 (1970).
[10] See, Burns, Why is the Polygraph Discriminated Against by Courts, in Legal Admissibility of the Polygraph, 22 (N. Ansley ed. 1975). Several courts have recently rejected the "general acceptance" standard as a criteria for the admission of spectrographic voiceprint evidence. United States v. Williams, 583 F.2d 1194 (2d Cir. 1978); State v. Williams, 388 A.2d 500 (Me.1978).
[11] However, McCormick recognizes that, among the weaknesses of our judicial process in the area of scientific proof, are (1) the selection of experts by the parties, so that the experts chosen are often biased and are sometimes not highly qualified, and (2) the difficulty for the jury of deciding between experts who disagree. C. McCormick, Evidence, § 203, p. 491 (2d ed. 1972).
[12] The leading case on stipulations for the admission of polygraph evidence is State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962). Admission by stipulation is now permitted in many federal and state jurisdictions. See, e. g., United States v. Oliver, 525 F.2d 731 (8th Cir. 1975), cert, denied, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); Corbett v. State, 584 P.2d 704 (Nev.1978); Robinson v. Wilson, 44 Cal. App.3d 92, 118 Cal.Rptr. 569 (1974); State v. Lassley, 218 Kan. 758, 545 P.2d 383 (1976); State v. Ghan, 558 S.W.2d 304 (Mo.App.1977); State v. Towns, 35 Ohio App.2d 237, 301 N.E.2d 700 (1978); State v. Bennett, 17 Or.App. 197, 521 P.2d 31 (1974); State v. Ross, 7 Wash. App. 62, 497 P.2d 1343 (1972); Cullin v. State, 565 P.2d 445 (Wyo.1977). Other states, including Louisiana, have continued to exclude polygraph evidence even upon stipulation. See, e. g., Pulakis v. State, 476 P.2d 474 (Alaska 1970); State v. Corbin, 285 So.2d 234 (La. 1973); People v. Liddell, 63 Mich.App. 491, 234 N.W.2d 669 (1975); Fulton v. State, 541 P.2d 871 (Okl. Cr.1975); Lewis v. State, 500 S.W.2d 167 (Tex. Cr.App.1973).

Those jurisdictions which admit polygraph evidence by stipulation reason that if a defendant agrees to the admission of polygraph test results then he should not be able to object if the subsequent results turn out to be unfavorable to him. Nevertheless, the trial judge is usually given the power to disallow all polygraph testimony regardless of the stipulation if he is not satisfied that the test results are reliable. See, e. g., State v. Valdez, supra.
Admission by stipulation has, however, been criticized. See, e. g., Tarlow, supra, note 6, at 953-56; Note, The Polygraphic Technique: A Selective Analysis, 20 Drake L.Rev. 330, 340-43 (1971). It has been suggested that it is illogical to deny admissibility on the ground that the evidence is unreliable and then admit the same testimony by stipulation.
[13] Several courts have held polygraph test results admissible in criminal trials over objection of opposing counsel and without prior stipulation. United States v. Ridling, 350 F.Supp. 90 (E.D.Mich. 1972) (polygraph test results held admissible in perjury conviction provided that defendant submit to additional tests performed by expert selected by the court and provided that the trial judge could exclude all polygraph evidence in his discretion if the tests proved inconclusive); United States v. Zeiger, 350 F.Supp. 685 (D.D.C.) Rev'd 155 U.S.App.D.C. 11, 475 F.2d 1280 (1972) (trial court found that polygraph test results had gained "general acceptance" within the field of polygraphy and that polygraph test results were admissible to assess the truthfulness of the defendant's answers to specific factual questions); State v. Dorsey, 88 N.M. 184, 539 P.2d 204 (1975) (state supreme court held that polygraph test results would be admissible when the trial court has evidence to support the expertise of the operator, the testing procedure, and the tests made on the subject). Other decisions have noted that polygraph evidence would be admissible upon a proper foundation. See, e. g., United States v. DeBetham, 348 F.Supp. 1377 (S.D. Cat), aff'd 470 F.2d 1367 (9th Cir. 1972); United States v. Wainwright, 413 F.2d 796 (10th Cir. 1969); Commonwealth v. A Juvenile, 365 Mass. 421, 313 N.E.2d 120 (1974).
[14] Defendant's expert witnesses testified that the modern polygraph examination achieves a high degree of accuracy when conducted by well qualified examiners under proper test conditions. However, there is an obvious weakness inherent in any attempt to determine the validity of examinations given in the context of actual criminal investigations, i. e., it is almost always impossible to verify the test results. See, Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694, 704 (1961). Moreover, research conducted in a laboratory is not a satisfactory substitute because it is difficult to arouse the emotional state necessary for a successful examination. Nevertheless, tests conducted in recent years have established that 90-95% of the test results were shown to have been accurate. See, e. g., Truth & Deception, supra, note 4, at 389-406 (four well-documented studies conducted by expert polygraph examiners). A review of earlier polygraph studies is found in Levitt, Scientific Evaluation of the Lie Detector, 40 Iowa L.Rev. 440 (1955). See also, Adams, Polygraphy Today, 3 J.Crim.Def. 85, 89-92 (1977); Barland, The Reliability of Polygraph Chart Evaluations, in Legal Admissibility of the Polygraph (N. Ansley ed. 1975); Tarlow, supra, note 6, at 927-934; Comment, The Emergence of the Polygraph at Trial, 73 Col.L.Rev. 1120, 1122-24 (1973). See also, United States v. Zeiger, supra.
[15] See, e. g., Truth & Deception, supra, note 4, at 296-303; Note, The Polygraphic Technique: A Selective Analysis, 20 Drake L.Rev. 330, 343-45 (1971). Several courts have acknowledged the importance of polygraphy as an investigative tool. See, e. g., Henderson v. State, 94 Okl.Cr. 45, 54, 230 P.2d 495, 504, cert, denied, 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1955).
[16] The American Polygraph Association promulgates a "Code of Ethics" and "Standards and Principles of Practice" for examiners. These guidelines are reprinted in N. Ansley, Admissibility of Polygraph Evidence in Criminal and Civil Cases, 14-16 (1978).
[17] See, Romig, Status of State Polygraph Legislation in July, 1972, in Legal Admissibility of the Polygraph (N. Ansley ed. 1975); Tarlow, supra, note 6, at 969-974. The following statutes have enacted legislation regulating polygraph examiners:

Arkansas (Ark.Stat.Ann. §§ 71-2201 to 2225 (Supp.1973)), Florida (Fla.Stat.Ann. §§ 493-40-56 (1974-75 Supp.)), Georgia (Ga.Code Ann. §§ 84-5001 to 5016 (1970)), Illinois (Ill.Stat. Ann. ch. 38, §§ 201-1 to 30 (1973)), Kentucky (Ky.Rev.Stat.Ann. §§ 329.010-.990 (1972)), Mississippi (Miss.Code Ann. §§ 73-29-1 to -47 (1972)), Nevada (Nev.Rev.Stat. §§ 648.005-.210 (1973)), New Mexico (N.M.Stat. §§ 67-31A-1 to -11 (2d Repl.Vol. 10 1974)), North Dakota (N.D.Cent.Code §§ 43-31-01 to -17 (Supp. 1973)), Texas (Tex.Civ.Stat. art. 4413 (29cc) (1974-75 Supp.)), and Virginia (Va.Code §§ 54-729.01-.018 (1974 Repl.Vol. 7A)).
[18] See, e. g., The Use of Polygraphs and Similar Devices by Federal Agencies: Hearings Before a Subcommittee of the House Committee on Government Operations, 93rd Cong., 2d Sess. 434-466 (1974); Abbell, Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials, 15 Amer.Crim.L.Rev. 29 (1977).
[19] We recognize that a persuasive argument for admissibility could be made on the ground that traditional and fundamental standards of due process require that an accused person be permitted to present witnesses in his own behalf and otherwise make out his defense to the state's charges. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). We believe, however, that the policy reasons for excluding polygraph evidence in the present case are more compelling than the evidentiary rules relied upon by the state courts in Chambers. The Supreme Court in Chambers recognized that the defendant's fundamental right to present evidence in his own defense" must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. 410 U.S. at 302, 93 S.Ct. at 1049, 35 L.Ed.2d at 313. We believe that the evidentiary rule excluding polygraph testimony in this case is validly designed to assure these goals.
[20] See, Abbel, Polygraph Evidence: The Case Against Admissibility in Federal Trials, 15 Amer.Crim.L.Rev. 29, 53 (1977) ("[T]he use of the polygraph machine lends an illusory aura of objectivity and accuracy which is likely to mislead jurors into giving undue weight to polygraph examinations."); Highleyman, The Deceptive Certainty of the Lie Detector, 10 Hastings L.J. 47 (1958); Kaplan, The Lie Detector: An Analysis of its Place in the Law of Evidence, 10 Wayne L.Rev. 381, 386 (1964); Radeck, The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo, 3 Loyola U.L.J. (Chic.) 289, 300-302 (1972). But see, Tarlow, supra, note 6, at 967-69.
[21] As stated in Truth & Deception, supra, note 2, at 5:

"The most important factor involved in the use of any such instrument is the ability, experience, education, and integrity of the examiner himself."
See also, Tarlow, supra, note 6, at 965-66; Comment, The Polygraph Revisited: An Argument for Admissibility, 4 Suff.L.Rev. 111, 119-120 (1969). This reliance has often been noted by courts considering the admissibility of polygraph evidence. See, e. g., United States v. Wilson, 361 F.Supp. 510, 512-13 (D.Md.1973); Commonwealth v. A Juvenile, 365 Mass. 421, 313 N.E.2d 120, 124-25 (1974).