EDWIN A. LOMBARD, Judge.
liThe Appellant, Jeffery Lewis, appeals his conviction for second-degree murder and his sentence of life imprisonment without benefit of probation, parole or suspension of sentence. Finding that the trial court did not err, we affirm his conviction and sentence.

STATEMENT OF THE CASE

On February 12, 2010, the State indicted brothers Christopher Lewis[1] and Jeffery Lewis for the October 19, 2009, second-degree murder of Jamal Harris (“the victim”). Jeffery Lewis (“the defendant”) pled not guilty at his arraignment on February 23, 2010.
*1255 In June 2010, the trial court denied the motion to suppress identification of the defendant. His motion to sever the trials, however, was granted by the trial court.
Following several continuances, the defendant’s trial began in late November 2011, and concluded with a verdict of guilty as charged. The defendant filed motions for new trial, post-verdict judgment of acquittal, to re-consider 12sentence, and for appeal. All of the motions, with the exception of the motion for appeal, were denied. The trial court sentenced him to life imprisonment without benefit of probation, parole or suspension of sentence on February 10, 2012.

STATEMENT OF FACT

Terrell Harris testified that he was sixteen years old at the time of the shooting and that the victim was a friend of his. They had been introduced to each other by the defendant and Christopher Lewis.
Harris recounted that on October 19, 2009, Kashunda Jones and the defendant picked him up, and they drove to the home of Monique and Brianna Allen around Columbia Street in New Orleans between 1:00 and 2:00 p.m. He explained that Monique and Brianna Allen were the cousins of Christopher Lewis and the defendant.
Harris testified that the victim arrived at the location in a truck a few minutes after he himself arrived. Harris recounted that he and the victim “messed around/ played,” and the victim poked Harris in the eye. The defendant told the victim: “You are going to stop messing with my little partner.” The victim and the defendant were about to fight when the victim said: “Man, let me get my issue,” and ran out of the house. The defendant, armed with a black .45 caliber gun, ran after the unarmed victim. After the defendant ran out of the house, Christopher Lewis and Harris, each armed with their own gun, ran outside. Harris testified that he was standing next to the defendant when the defendant shot the victim. When the victim fell, Harris shot him. Christopher Lewis took Harris’ gun fi-om him, telling him, ‘You don’t know what you are doing” and Christopher Lewis proceeded to shoot the victim. Harris further testified that the defendant fired fifteen shots and Christopher Lewis fired ten shots. Harris testified that the |sdefendant and Christopher Lewis had given him the gun he had at the time of the murder.
Additionally, Harris testified that Brianna Allen removed the victim’s cell phone from his pocket, and he, Christopher Lewis, and the defendant jumped into a car driven by Kashunda Jones and drove away. The defendant and Christopher Lewis put their guns into a backpack. Harris never saw the guns again. Harris testified that he left the others and went home.
Harris further recounted that the following morning, the police arrested him at his mother’s house and transported him to headquarters. In the presence of his mother, he was Mirandized, waived his rights and gave a recorded statement, a portion of which was played for the jury. After he made the statement, homicide Det. Anthony Pardo (“Det. Pardo”) presented him with photo lineups from which Harris identified the defendant, Christopher Lewis and Kashunda Jones. Thereafter, Harris was charged with second-degree murder and transferred to juvenile jail.
Harris testified that approximately two years after the' shooting, he and his mother met with someone from the District Attorney’s office, who told Harris that he if told the truth at the defendant’s trial, he would be charged in Juvenile Court with manslaughter. Subsequent to signing the agreement with the District Attorney’s office, Harris met with and explained to the prosecutors what happened to the victim.
*1256 During his trial testimony, Harris viewed State’s Exhibits 94A and 94B, pictures of Christopher Lewis and the defendant holding guns. Harris said that the guns in the pictures looked like the gun the defendant had at the time of the shooting.
| „Brianna Allen testified that at the time the victim was shot, she and her sisters, Monique and Tonika,[2] resided at 1251 Columbus Street near Marais Street. She stated that the day of the shooting she was at her home with the defendant, Christopher Lewis and several other family members. She heard gunshots and then noticed the defendant and Christopher Lewis standing in the front door with guns in their hands. She did not see the shooting and did not know whether the victim had a gun at that time. Brianna Allen said that immediately after hearing the gunshots, she went outside where family members and others had gathered. When she realized that the victim was dead, she sat next to his body.
In addition to family members and neighbors who gathered after the shooting, Brianna Allen testified that she noticed Harris jumping up and down in the crowd obviously excited and shouting that he had shot the victim in the head.
Brianna Allen recalled speaking to the police that day and giving them a recorded statement at the police station. To refresh Brianna Allen’s memory, the State played portions of her recorded statement. However, when questioned about the guns and what she said the defendant said to her after the shooting, Brianna Allen said she lied about that information because she was mad at the defendant, who is her cousin.
Lisa Thornton testified that her job as an investigator with the Orleans Parish District Attorney’s Office requires her to locate witnesses and speak with victims. During the course of her employment, Ms. Thornton spoke with Brianna Allen on October 5, 2011, in the presence of the prosecutors in the District ^Attorney’s office. At the meeting, the prosecutors played Brianna Allen’s recorded statement, but she recanted everything she had said in her statement. Ms. Thornton further related that Brianna Allen said that on the day of the shooting, both the defendant and Christopher Lewis had guns. Brianna Allen further indicated that the defendant called her a “ho” because “she was worried about someone that wasn’t even related to them.” Ms. Thornton recalled that after Brianna Allen recanted her statement, she explained that she was nervous and scared about testifying against a family member. However, Ms. Thornton explained that at no time did Brianna Allen say that what she said to the police was a lie.
Verlena Wilson, the victim’s mother, testified that the victim was twenty years old at the time of his death. Ms. Wilson testified that the victim introduced a woman named “Gabby” to her as his girlfriend, and he told Ms. Wilson that Gabby was pregnant with his child. Ms. Wilson further testified that she knew that the defendant and Christopher Lewis were Gabby’s brothers and friends of the victim. Mrs. Wilson recounted that the victim lived with Gabby, the defendant and Christopher Lewis at the Lewis residence from April to July 2009. However, he moved out of the Lewis house prior to his death because of a falling out with the defendant and Christopher.
*1257 Off. Hilary Hunt of the New Orleans Police Department testified that on October 19, 2009, at approximately 12:45 p.m., she and her partner, Off. Neka Beechem, responded to a call of gunfire in the 1500 block of Marais Street. At the scene, Off. Hunt observed the non-responsive victim lying face down on the ground in a puddle of blood in front of the 1512 Marais Street residence. Off. Hunt testified that she and Off. Beechem were the first officers on the scene. Off. Hunt initiated a major crime sign-in sheet, cordoned off the area and called for REMS. Medical personnel attempted to revive the victim, but to no avail, and the victim was pronounced dead at the scene. Off. Hunt’s participation in the investigation of this case ended when the crime scene technicians arrived. She turned over the scene to a Det. Sosa.[3]
Det. Pardo was the lead detective on this case. He testified that he and his partner, Det. Wischan,[4] reported to the scene. Det. Pardo recounted that he assessed the scene and delegated certain police personnel to canvas the area, notify family members and the crime lab and supervise collection of evidence. The inspection of the crime scene, which was approximately one-half block in length, yielded a number of spent bullet casings and fired bullets — .45 caliber and 9 mm ammunition. The casings and bullets were found in close proximity to the victim’s body on the sidewalk. Det. Pardo testified that he directed Detectives Kevin Burns and Melanie Dillon to interview witnesses/sisters, Brianna and Tonika Allen, who were at 1251 Columbus Street. Both of the sisters were transported to police headquarters to give statements. Det. Pardo testified that he took a statement from Tonika Allen. Det. Christopher Harris secured a search warrant for 1251 Columbus Street. After speaking with the witnesses, he obtained arrest warrants for the defendant, Christopher Lewis and Terrell Harris for second-degree murder and for Kashunda Jones as an accessory after the fact for driving the subjects away from the scene.
Det. Pardo further recounted that Christopher Lewis and Kashunda Jones were arrested in Jefferson Parish at the home of the defendant’s mother, Ms. Lewis. Ms. Lewis consented to her residence being searched, and as a result ^eleven photographs, a social security card in the defendant’s name, one plastic bag containing four live 9 mm rounds, one Winchester 12-gauge shotgun shell, two cell phones, a gun cleaning kit, a shoe box, one Enterprise car rental agreement and one backpack containing Halloween masks were recovered from her residence. Det. Pardo testified that the 9 mm bullets taken from Ms. Lewis’ house were consistent with the 9 mm brand of bullets fired at the scene. The Enterprise car rental agreement bore the name Amelia Lewis and was for the rental of the 2009 Chevy Malibu, which, Det. Pardo testified, was the vehicle used by Kashunda Jones to drive the suspects away from the shooting scene. The vehicle was searched pursuant to warrant, but nothing was confiscated.
Lastly, Det. Pardo testified that the defendant was arrested in Algiers at a residence on Newton Street, which was searched pursuant to a warrant. However, no evidence was recovered.
Det. Kevin Burns received a call on October 19, 2009, from Sgt. Catalanotto[5] *1258 about a homicide in the Columbus/Marais Street area. Det. Burns met with Tonika and Brianna Allen, who were witnesses at the scene of the shooting. Det. Burns testified that from his conversation with them, he developed the names of the suspects. Det. Burns testified that he compiled three photographic lineups, which he displayed for the witnesses. However, before displaying the lineups, he and Det. Melanie Dillon obtained two recorded statements from Brianna Allen on the day of the shooting. Brianna Allen identified the photo of the defendant (number 5) from one of the lineups as one of the men she saw holding a gun, and from the other lineup, Brianna Allen identified photo number 3 as the picture of the 18co-perpe-trator. From the third photo lineup, Brianna Allen identified photo number 1 as the third suspect.
Aven Cooper, a fifteen-year veteran of the NOPD as a crime scene technician and forensic examiner, defined her responsibilities as photographing crime scenes, collecting evidence and dusting for fingerprints. Ms. Cooper testified that she remembered examining the crime scene on Marais Street the day of the shooting. She obtained direction from one of the investigating officers as to what evidence, examinations, photos, sketches, etc., were needed. She explained to the jury the contents of the photographs taken at the scene. Further, Ms. Cooper indicated that her report listed that four copper fragments, eight spent .45 caliber casings, seven spent Winchester 9 mm Luger casings, one live 9 mm Luger cartridge and a live WCC-80 cartridge were collected from the scene. All of the live and spent bullets along with the casings were deposited into Central Evidence and Property.
Now retired Sgt. Byron Winbush was qualified by stipulation as an expert in firearms examination and ballistics. The sergeant testified at length about the testing protocol employed to identify types of firearms and ammunition and procedures used to link them to evidence from a particular crime. Sgt. Winbush verified that he performed ballistics testing in this case and produced a report of his findings dated February 13, 2010, under item number J-26603-09. He tested four .45 caliber bullets, one .45 caliber copper jacket, eleven .45 caliber cartridge cases, seven 9 mm cartridge eases and two unknown caliber copper bullet jackets, all of which were recovered from the shooting scene. From his testing, Sgt. Winbush determined that all of the .45 caliber cartridge cases and five .45 caliber bullets were fired from the same unknown .45 caliber weapon. Also, the seven 9 mm |9cartridge cases were fired from the same unknown 9 mm weapon. Lastly, Sgt. Winbush testified that no weapons were recovered in this case.
Dr. Richard Tracy performed the autopsy on the victim’s body and determined that the victim suffered two fatal gunshot wounds to the heart. The doctor also testified that test results on the victim’s blood for commonly used street drugs and alcohol were negative.
Don Hancock testified that in his position with the Orleans Parish Sheriffs Office he oversaw the operations of the telecommunications systems at the Orleans Parish jail, including the inmate phone system. Mr. Hancock explained that each inmate is assigned a folder number which enables the system to track and record all inmate calls. Mr. Hancock identified State’s Exhibit 103 as a call placed by the defendant while incarcerated. The call was played for the jury.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

*1259
ASSIGNMENTS OF ERROR

The defendant raises three (3) assignments off error on appeal:
1. The evidence is insufficient to support the conviction.
2. The trial court erred in denying the motion for new trial.
3. The trial court erred in denying the motion in limine.

ASSIGNMENT OF ERROR 1

In the defendant’ first assignment of error, he contests the sufficiency of the evidence to support his conviction for second-degree murder. He claims that the evidence was insufficient to identify him as the shooter. We note that the defendant does not argue that the State failed to prove the elements of second-degree murder.
|inIn evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, “assuming every fact to be proved that the evidence tends to prove.” La.Rev.Stat. 15:438. The statutory requirement of La. Rev.Stat. 15:438 “works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury.” State v. Neal, 00-0674, p. 9, 796 So.2d 649, 657.
As a general matter, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Smith, 430 So.2d 31, 45 (La.1983). However, positive identification by only one witness is sufficient to support a conviction. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988). The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and credibility will not be reweighed on appeal. State v. Vessell 450 So.2d 938, 943 (La.1984). A reviewing court may impinge on the fact-finder’s discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Harris, 02-1589, p. 4 (La.5/20/03), 846 So.2d 709, 713.
By returning a guilty verdict, in the instant matter, the jury obviously believed the testimony of the State’s witnesses. Harris testified that he was [^standing next to the defendant when the defendant shot the victim. Furthermore, both Brianna and Tonika Allen testified that they observed that the defendant was armed immediately after the shooting. All of the witnesses were well acquainted with the defendant; either by friendship or family connections,' and all gave harmonious statements to the police concerning the shooting. The victim was shot during daylight hours in full view of the witnesses.
Additionally, the jury heard testimony.that after the shooting the defendant fled in a vehicle driven by Kashunda Jones. The jury also learned from one of the defendant’s jailhouse telephone calls that he threw the murder weapon into the river. Evidence of flight, concealment, and attempting to avoid apprehension “indicates consciousness of guilt, and therefore, is one of the circumstances from which a juror may infer guilt.” State v. Davies, 350 So.2d 586 (La.1977).
The defendant also attacks Harris’ testimony as unworthy of belief because Harris *1260 “got a deal” and “in exchange ... testified against [the defendant].” The defendant argues that, “Terrell Harris was a co-perpetrator, a juvenile who was allowed to plead to ... [manslaughter], and allowed to have his case remain in Juvenile Court where he would by the Children’s Code receive a shorter sentence than if [his] case were removed to criminal court.”
We find that the defendant’s argument is unconvincing. The record shows that Harris candidly testified about his “deal” with the State. The jury heard him explain that he gave the police his statement immediately after the shooting, and that there was no deal confected in exchange for his testimony against the defendant until two years after the victim’s death.
“The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]” State v. Higgins, 03-1980, p. 17 (La.4/1/05), 898 So.2d 1219, 1232. “Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.” State v. Marshall, 04-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369. To the extent the jury chose to credit Harris? testimony to the defendant’s detriment was not unreasonable and certainly within its province as the fact finder. We find that this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2

The defendant’s second assignment of error is that the trial court erred in denying his motion for new trial. His argument has three subparts: 1) the trial court erred in admitting the statement of Tonika Allen into evidence; 2) trial court erred by admitting the tapes of telephone calls he made while he was incarcerated and awaiting trial; 3) a Vietnamese juror should have been excused because the language barrier prevented that juror from understanding the trial proceedings; 4) the trial court made two erroneous rulings which the defendant claims curtailed his constitutional right to present a defense; 5) the trial court erred in not allowing a copy of the autopsy protocol into evidence, and 6) that rather than declare a mistrial, as warranted by the law and facts of the case, the trial court gave the jury a “veiled” Allen charge, thereby mandating reversal of his conviction.
In the first subpart of this assignment of error, the defendant argues that the trial court erred in admitting Tonika Allen’s statement into evidence.[6] He bases his argument on La.Code Crim. Proc. art. 851(2), which provides that on motion of the defendant, the trial court shall grant a new trial whenever “[t]he court’s ruling 113on a written motion, or an objection made during the proceedings, shows prejudicial error.” According to La.Code Crim. Proc. art. 851, a new trial motion “is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.”
A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 820. A trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court’s ruling is limited to determining whether the trial court abused its dis- *1261 eretion. State v. Labran, 97-2614, p. 6 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907.
In this case, when the State called Toni-ka Allen to testify at trial, she invoked her Fifth Amendment privilege, and the trial court allowed the State to play her statement for the jury.[7] The defendant argues that he was prejudiced by the admission of the statement and that Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), makes clear that the admission of 1 ^“testimonial” statements, such as Tonika Allen’s in this ease, violate the Sixth Amendment.
She gave a statement to the police at police headquarters on the day of the shooting. The police were able to identify the defendant and Christopher Lewis as suspects in the shooting and obtained warrants for their arrest based upon her statement.
The State counters that her statement is non-testimonial and, therefore, the admission of the recording did not implicate the Confrontation Clause. The State argues that the primary purpose of her statement and of the questioning by the detective was to address and resolve the ongoing emergency.
Traditionally, for purposes of the Confrontation Clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement fell under a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.” Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). However, the United States Supreme Court overruled Roberts insofar as it applies to out-of-court statements that are “testimonial” in nature in Crawford. Crawford drew a distinction between testimonial and nontestimonial hearsay and held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Crawford, 541 U.S. at 68, 124 S.Ct. at 1374.
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. Statements are testimonial when the circumstances objectively indicate that there is | iSno such ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273-2274, 165 L.Ed.2d 224 (2006).
Applying the Crawford test to matter sub judice, Tonika Allen’s out-of-court testimonial statement was admissible only if: 1) she was unavailable to testify and 2) the defendant had a prior opportunity to eon- *1262 front her. Pursuant to La. Code Evid. art. 804, “a declarant is ‘unavailable as a witness’ when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court.”
The record in this case shows that Toni-ka Allen was unavailable because she invoked her Fifth Amendment privilege and refused to testify. Nevertheless, the record does not indicate that the defendant had a prior opportunity to confront her, sufficient to satisfy the principles set forth in Crawford.
We find that the State’s assertion that Tonika Allen’s statement was non-testimonial hearsay in that it was given in order to assist the police address an ongoing emergency is questionable. Considering the U.S. Supreme Court’s holding in Davis, we find that her statement was testimonial hearsay as the primary purpose of her interrogation was to establish or prove past events potentially relevant to later criminal prosecution. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. Crawford, 541 U.S. at 68-69, 124 S.Ct. at 1374. Thus, we find that the defendant’s Sixth Amendment right was violated by the admission of Tonika Allen’s statement because he was not given the opportunity to confront Tonika Allen. Nevertheless, even if the statement was improperly admitted, confrontation | merrors, including Crawford violations, are subject to a harmless error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Louisiana Supreme Court explained the applicable harmless error analysis:
The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt.... Factors to be considered by the reviewing court include “the importance of the -witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.”
State v. Wille, 559 So.2d 1321, 1332 (La.1990) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).
In this case, Tonika Allen’s statement was cumulative evidence. Harris testified that he witnessed the defendant shoot the victim and was standing next to the defendant when he did so. Further, Brianna Allen recalled seeing the defendant and Christopher Lewis with guns in their hands immediately after she heard the gunfire. Thus, considering the evidence presented at trial, the error was hármless as the guilty verdict rendered was unattributable to thé error.
The second subpart of the defendant’s second assignment of error is that the trial court erred by admitting the tapes of telephone calls he made while he was incarcerated and awaiting trial. He claims the contents of the calls were not relevant to this case, and that his use of profanity and racially charged epithets in the calls inflamed the jury against him.
The defendant does not identify which portions of the tapes he objects to, and there is no transcription of the calls contained in the record. However, in Inclosing rebuttal argument, the prosecutor referenced portions of the calls in which the defendant is heard to say “what he is going to do to Gabby, what he is going to do to Brianna, what he wants to do to Tonika when he gets out.” The *1263 prosecutor also noted that the defendant asks: “What did Brianna say? What did Tonika say? I’m going to take care of them.... Terrell is a rat. Terrell told the police what happened. I’m going to take care of Rell’, too.” Finally, the prosecutor states that on the tape the defendant told his girlfriend what he did at the scene: “I picked up my [9 mm] bullets and I threw my gun into the river, got rid of my gun ... Man, they got nothing. They don’t have a weapon ... My mom thought of everything. I was across the river ... Mom said get rid of that. We would have gotten popped with that. Rock with that. Switch it out.”
La.Code Evid. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” “A trial court’s ruling as to relevancy will not be disturbed absent a clear abuse of discretion.” State v. Lewis, 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. See State v. Lambert, 98-0730, p. 22 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755. Moreover, evidence of a defendant’s attempt to threaten, kill, intimidate or dissuade a witness from testifying is admissible and relevant to show consciousness of guilt on the defendant’s part and his desire to evade prosecution. See State v. Burnette, 353 So.2d 989, 991, n. 1 (La.1977)
The jail recordings herein were relevant to the State prosecuting the defendant in this case for second-degree murder. The excerpts from the telephone 11Rcall referenced in the State’s closing argument show his intent to deal with/intimidate the witnesses against him. Further, the jail recording excerpts document his concealment/destruction of evidence, “is relevant and • admissible' to prove consciousness of guilt from which the factfin-der may infer guilt.” State v. Brown, 02-1922, p. 10 (La.5/20/03), 846 So.2d 715, 722 (citing State v. Wilkerson, 403 So.2d 652 (La.1981)). Additionally, when a defendant flees or attempts to avoid apprehension, the trier of fact may infer a guilty conscience. State v. Cazenave, 00-183, 00-184, p. 13 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 860. Consequently, we find that the recordings were relevant and probative of the defendant’s guilt.
In a third sub-part of the instant assignment of error, the defendant argues that a Vietnamese juror, Juror Tran, should have been excused because the language barrier prevented him from understanding the trial proceedings. The defendant points out that Juror Trán expressed the inability to understand certain terms used by the lawyers, such as “impartial,” “burden,” “coroner,” and “presumption.”
We note that there- is no indication from the record that defense counsel object to Juror Tran’s qualifications to serve as a juror. Moreover, the record does not indicate that the defense exhausted its peremptory challenges. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. State v. Campbell, 06-0286, p. 70 (La.5/21/08), 983 So.2d 810, 856 [citations omitted], Thus, this issue has' not been preserved for appellate review.
Additionally, La.Code Crim. Proc. art. 401 states that jurors must be able to read, write and speak English and be free of mental or physical incapacity. The 119question of a juror’s qualifications is addressed to the sound discretion of the trial judge. State v. Mitchell, 08-136, p. 22 (La.App. 5 Cir. 1/13/09), 7 So.3d 720, 734. A trial judge is afforded great discre *1264 tion in determining whether cause has been shown to reject a prospective juror. State v. Williams, 457 So.2d 610, 613 (La.1984).
In this case, after the jury was selected but prior to the commencement of trial on November 29, 2011, the trial judge brought Juror Tran into chambers to examine his communication skills. He revealed that he has lived in this country for thirty-two years; he attended two years of high school in the city, but dropped out to work in the hotel industry. He said he was able to speak and write basic English, and that he was able to read the newspaper and watch television but did not understand everything that was written or said. Juror Tran admitted that he did not say during voir dire that he had a limited understanding of the English language. After he left the judge’s chambers, the judge spoke to defense counsel about his apprehension as to Juror Tran’s ability to understand. Defense counsel acknowledged that he repeatedly asked the potential jurors, including Juror Tran, if they understood all that was being said and asked of them, and that Juror Tran did not indicate he had any difficulty. The trial judge then voiced her opinion of Juror Tran’s capabilities:
... the gentleman has been here thirty-three (sic) years, he watches English TV, he reads the English newspaper and he is living and working in this society and indicated — he answered all of the questions.
[[Image here]]
I feel like he has been traversed significantly enough and I’m going to keep him on the jury. I?m comfortable that he understands what he is doing.
|20Based upon the record in this case, it does not appear that the trial court abused its discretion in determining that Juror Tran’s communication problem was not so severe as to render him incapable of serving as a juror.
In the fourth subpart of this assignment of error, the defendant cites two erroneous trial court rulings which he claims curtailed his constitutional right to present a defense. The defendant contends that the errors stemmed from the court’s refusal to allow the defense to question the coroner concerning a tattoo of the name “Gabby” on the victim’s chest and the “apparent” crack cocaine in the decedent’s gluteus.
As to the tattoo, the defendant argues that the evidence was needed to show that the victim loved Gabby Lewis and to refute the testimony of the victim’s mother that Gabby Lewis had threatened the victim and that the two had been having problems. The defendant argues that “[t]he evidence of the tattoo was relevant in that it made the fact that the victim and Gabby Lewis were in a strong relationship-and thus not one where Gabby would get her brothers to kill [the victim].”
It is extremely unlikely that the court’s refusal to allow the defense to raise the issue of the “Gabby” tattoo deprived the defendant of the opportunity to build his defense at trial while allowing the State to build a motive for the killing. While the victim’s mother did testify as to non-particularized threats against the victim, she also said that the victim introduced Gabby Lewis to her as his girlfriend and informed her that Gabby was pregnant with his child. Further, the victim’s mother said that the victim had lived with the Lewis family, and that she knew the defendant was a friend to the victim. Moreover, Harris, who was present before and after the shooting began, testified that the defendant’s warning to the victim to |2rstop messing with Harris prompted the victim to run out of the house “to get his issue,” which in turn caused the defendant and *1265 Christopher Lewis to- arm' themselves. There was no evidence that the shooting related in any way to Gabby Lewis; thus, it does not appear that the exclusion of the evidence of the tattoo inhibited the defendant’s ability to assert his defense as he consistently maintained his innocence in the shooting death of the victim.
As for the defendant’s reference to the “apparent” crack cocaine in the victim’s gluteus, there was no evidence that anything was found in the victim’s gluteus, let alone cocaine. The coroner, Dr. Tracy, was questioned by defense counsel about the presence of drugs on the body of the victim: “During your examination, upon an examination of the gluteal area, you found a small wad of tissue paper with several pieces of crystal objects inside of it?” Dr. Tracy responded: “I don’t remember that detail.” Thus, we find that neither of the claims raised by the defendant in this portion of his second assignment of error has merit.
Under the fifth subsection of this assignment of error, the defendant argues that the trial court erred in not allowing a copy of the autopsy protocol into evidence. He asserts that the protocol was important and should have been reviewed by the jury “in order ... to determine the weight to give the tattoo as well as the suspected crack found in a crevice of the [victim’s] body.” However, as discussed above, the existence of the tattoo does not support the defendant’s argument of lack of motive to kill the victim as this shooting had nothing to do with Gabby Lewis. Additionally, his claim of “suspected” crack cocaine being found in the victim’s gluteus is a fabrication.
^Finally, under this assignment, the defendant maintains that rather than declare a mistrial, as warranted by the law and facts of the case, the trial court gave the jury a “veiled” Allen charge, thereby mandating reversal of his conviction.
An Allen charge refers to-, jury instructions intended to break a deadlocked jury. The term refers to a decision by the U.S. Supreme Court in Allen v. U.S., 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the court considered additional jury instructions given after the jury had returned from deliberations seeking further instruction as follows:
[T]hat in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; ’ that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other’s arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.
Allen v. U.S., 164 U.S. at 501, 17 S.Ct. at 157. The U.S. Supreme Court found no error in the giving of the instruction.
Nevertheless, Allen charges are disfavored in Louisiana for two reasons: (1) the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial; and (2) “ ‘when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an al *1266 most overwhelming pressure to conform to 1the majority’s view.’ ” State v. Alvarez, 00-0819, pp. 14-15 (La.App. 4 Cir. 7/18/01), 792 So.2d 875, 885 [citations omitted].
The defendant argues that the timeline of deliberations supports his contention that the jury was exhausted and confused which caused “most of the jurors ... to give in so they [could] go home.”
On the third day of trial, the case went to the jury at approximately 8:30 p.m. The jury requested that the judge re-read the definitions of each possible charge. The judge re-read the definitions of second-degree murder, manslaughter and negligent homicide. Then the jurors asked that they be allowed to bring the legal definitions into deliberations. The trial judge refused but agreed to re-read the definitions as many times as the jury requested. The jury asked the trial judge to re-read the definition of “a principal to a crime,” which she did. Following that, the jury requested an explanation of the definition of negligent homicide. The trial judge explained that she was not allowed by law to give an explanation of negligent homicide and re-read the definition once again. Court recessed, and the jury returned to deliberate further.
At approximately 11:30 p.m., the jury foreman informed the trial judge that the jury had been unable to reach a verdict. The trial judge inquired of the foreman whether additional deliberation would assist. The foreman responded: “It is very difficult to say ... we are at impasse ...” The trial judge offered to re-read the definitions, but the foreman indicated that it was not a matter of anything missing from their deliberations but rather a hesitation about what was the correct decision. The trial judge responded:
... I know it has been a long month, but we have spent an extensive amount of time on this case, so I?m going to ask you, as the 12 jurors in this case, to continue ] ^to deliberate and make every effort to speak to your fellow jurors and try to come to some sort of conclusion, to the best of your abilities, and I’ll ask you to go back to the jury room.
The jury deliberated again and returned with its verdict.
The defendant contends that the trial court’s foregoing advice to the jury amounted to telling the minority juror or jurors to vote in accordance with the majority of the jury.
There is no requirement that a judge declare a mistrial at the initial sign of trouble. State v. Anders, 06-589, p. 12 (La.App. 3 Cir. 9/27/06), 941 So.2d 93, 101 (citing State v. Lowenfield, 495 So.2d 1245 (La.1985)). It is within the discretion of the trial court to urge jurors to come to an agreement. Id. (quoting State v. Governor, 331 So.2d 443 (La.1976)). The record in this case does not support the defendant’s argument. The jury had been deliberating only three hours when it declared itself “at an impasse.” None of the jurors informed the judge that he was exhausted or wanted to adjourn for the night, nor was there any indication that any .juror felt pressured to abandon his opinion. In fact, the foreman informed the judge that they had been discussing the case in great detail and that all of the jurors were very respectful of each other’s opinions and honest about how they felt. We find that the trial judge’s direction to the jury “to continue to deliberate and made every effort to speak to your fellow jurors and try to come to some sort of conclusion, to the best of your abilities ...” did not suggest that the jury had a duty to reach a verdict, or imply that the trial judge would not accept a mistrial. Allen v. U.S., supra.
There is no support in the record for any of the defendant’s claims of error in the denial of his motion for new trial. This assignment of error is without merit.

*1267
\ .ASSIGNMENT OF ERROR NUMBERS

In his third assignment of error, Lewis argues that the trial court erred in denying his motion in limine by which he sought to exclude photographs of himself and Christopher Lewis holding firearms.[8] The defendant reasons that the picture was irrelevant because no witness identified the gun in the photograph as the same kind the defendant was armed with the day of the shooting. Also, the defendant argues that thé picture was unduly prejudicial because its only purpose was to portray him as an armed and dangerous person.
The State counters that the photograph was offered to prove the defendant’s commission of murder in this case and to show only that the defendant had access to weapons of the type used in this shooting.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing, or place depicted. State v. Landry, 388 So.2d 699, 704 (La.1980). The trial court has great discretion in admitting photographs into evidence, and the court’s ruling will not be disturbed absent an abuse of that discretion. Id.
Relevant evidence is “evidence having any tendency to make the existence of fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.” La.Code Evid. art. 401. To be admissible at trial, demonstrative evidence must first be identified. La.Code Evid. art. 901. Identification can be visual or by chain of custody of the object. Landry, 388 So.2d at 704. The identification need not be absolute, certain or wholly unqualified. State v. Mills, 505 So.2d 933, 946-949 (La.App. 2 Cir.1987) (it is sufficient “if a preponderance of evidence establishes that it is more probable than not, the evidence is connected with the case,” •“... the weight to be given to the evidence is a question for the jury.”).
In State v. Manieri, 378 So.2d 931 (La.1979), the trial court admitted into evidence three knives which were “similar” to the murder weapon but which were not used in the slaying. The Supreme Court held that the trial court erred in admitting the knives into evidence; however, such error was harmless because no effort was made to connect the knives to the crime or to the defendant, and a State witness testified that the knives were not the murder weapon. Id., 378 So.2d at 933.
Similarly, in State v. Villavicencio, 528 So.2d 215 (La.App. 4th Cir.1988), the trial court admitted a .22 caliber rifle and bullets, .357 Caliber bullets, and photographs of the defendant’s car showing these items in the interior of the vehicle. The defendant was charged with shooting the victim with a handgun. Id., 528 So.2d at 216. This Court found that the trial court erred in admitting the evidence because it was prejudicial, citing Manieri, but did not specifically find that the prejudicial effect outweighed any probative value of the. evidence. Id., 528 So.2d at 217. This Court went on to find no reversible error because the State had not attempted to link the rifle and the .22 caliber bullets with the shooting. Id. No statement regarding any argument by the State concerning such evidence was made.
In this case, the record shows that no effort was made by the State to connect the gun in the photograph to the murder or exploit the admission of the gun in *1268 argument. While there was no evidence that the weapon in the photograph was used in this murder, it matched Harris’ description of the gun that he observed in | a7the possession of the defendant at the scene. Consequently, in accord with Ma-nieri and Villavicencio, we find that this assignment of error is without merit.

DECREE

For the foregoing reasons, the conviction and sentence of Jeffery Lewis are affirmed.
AFFIRMED.

. On November 28, 2011, the State amended the indictment as to Christopher Lewis to manslaughter. The indictment also charged Kashunda Jones as an accessory after the fact to second-degree murder. The defendants were tried separately, and this appeal pertains to Jeffrey Lewis only.

. Tonika Allen was called by the State as a witness, but she invoked her Fifth Amendment privilege, refusing to answer any questions. However, the trial court allowed the State to play for the jury her statement, State Exhibit 105, which she gave to the police immediately after the shooting.

. Det. Sosa's full name is not contained within the record.

. Det. Wischan’s full name is not contained within the record.

.Sgt. Catalanotto’s full name is not contained in the record.

. Tonika Allen's statement from which the police developed the defendant and Christopher Lewis as suspects was given to Det. Burns on the same day as the shooting.

. Prior to allowing the State to play Tonika Allen’s statement, the trial court cautioned the jury:
The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter or by evidence that at some other time the witness said or did something that is inconsistent with the testimony that the witness gave at trial.
Earlier statements of the witness are not admitted into the evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and, therefore, whether they affect the credibility of that witness. If you believe that a witness has been discredited in this matter, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

. The picture was seized from the defendant’s mother’s house pursuant to her consent to allow the police to search her home.