## NOT DESIGNATED FOR PUBLICATION

### STATE OF LOUISIANA

### COURT OF APPEAL

### FIRST CIRCUIT

### 2020 KA 0682

### STATE OF LOUISIANA

### VERSUS

### JINEL SEXTON

*DATE OF JUDGMENT:* ˙APR 1 6 2021

ON APPEAL FROM THE TWENTY-SECOND JUDICIAL DISTRICT COURT
NUMBER 587039, DIVISION G, PARISH OF ST. TAMMANY
STATE OF LOUISIANA

HONORABLE SCOTT C. GARDNER, JUDGE

* * * * * *

Warren L. Montgomery
District Attorney
Matthew Caplan
Assistant District Attorney
Covington, Louisiana

Counsel for Appellee
State of Louisiana

Julie Christine Tizzard
New Orleans, Louisiana

Counsel for Defendant-Appellant
Jinel Sexton

* * * * * *

BEFORE: WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

Disposition: **CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE AFFIRMED.**

**CHUTZ, J.**

The defendant, Jinel Sexton, was charged by bill of information with sexual battery (on a victim under the age of thirteen years), a violation of La. R.S. 14:43.1(C)(2). He pled not guilty. After a trial by jury, he was found guilty as charged. The trial court sentenced the defendant to fifty years imprisonment at hard labor, with twenty-five years to be served without the benefit of probation, parole, or suspension of sentence. The defendant admitted to the allegations in a habitual offender bill of information filed by the State, and the trial court adjudicated the defendant a second felony habitual offender. The trial court vacated the original sentence and resentenced the defendant to fifty years imprisonment at hard labor without the benefit of probation or suspension of sentence, with twenty-five years to be served without the benefit of parole. The defendant now appeals, assigning as error the admission of recorded jail calls at trial. For the following reasons, we affirm the conviction, habitual offender adjudication, and sentence.

## STATEMENT OF FACTS

On January 15, 2017, at 6:55 a.m., J.B. (the victim), who was twelve years old at the time, called 911 and reported being "raped" the night before.[1] The incident occurred at the Abita Springs residence of the defendant, the biological father of the victim's older sister. The victim told the dispatcher that the defendant had left to go to work prior to the time of the call and that she was in the home alone, as the defendant's sons who lived there were at their grandmother's house at the time. She stated that she had already contacted her parents, who lived in Ponchatoula, and that they were on their way to the defendant's residence, but that she wanted someone closer to come to the residence. The victim also stated that the defendant had given her some "medicine" that was supposed to treat acne,

---

[1] Because J.B. was a minor, we use initials to refer to her. See La. R.S. 46:1844(W).

2

adding that he had given her "two of them and a green tiny one."[2] She further stated that she did not remember falling asleep, but noted that when she woke up, "[the defendant] was like touching all over me and stuff." The victim made consistent claims to Detective Carlee Messina of the St. Tammany Parish Sheriff's Office, who reported to the St. Tammany Parish Hospital, where the victim was transported by the 911 responders.

Later that morning, the defendant was transported by deputies to Detective Messina's office. Detective Messina informed the defendant of his *Miranda*[3] rights and a waiver of rights form was executed. After the interview, Detective Messina obtained a warrant for the defendant's arrest, a search warrant for his residence, and later obtained a search warrant for the defendant's DNA. In executing the search warrant for the defendant's residence, Detective Messina recovered and/or photographed several items including a green t-shirt with gray print on it,[4] bedding, a Flintstones vitamin bottle, and prescription bottles. In addition to the pretrial interview, the defendant testified at trial. The defendant denied having given the victim any medications but stated that when he was taking vitamins, the victim asked for one, and he gave her one. According to the defendant, when he was awakened by his alarm clock the next morning, the victim was on top of him, and it "freaked [him] out." He explained that his first reaction was to get her off of him and then he had a conversation with her. The defendant said that he told the victim, "this is not right" and that "[she] shouldn't be doing this." He testified that an incident of that nature had never occurred before that morning.

---

[2] Regarding the "medicine" the defendant claimed would treat acne, the victim noted that the defendant gave her "two" but would normally give her "three of them."

[3] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

[4] At trial, Kathy Hebert, the defendant's girlfriend, testified that the green t-shirt in evidence belonged to her.

3

Detective Messina scheduled a recorded interview of the victim for January 24, 2017, at the Children's Advocacy Center, in which the victim again made consistent claims against the defendant. The victim stated that she was taken to the hospital because "[her sister's] dad was being nasty." She specifically added that close to nighttime, the defendant (Smiley) gave her a green vitamin and two little white "powdery pills" that he told her would get rid of acne, and she fell asleep. When she woke up, she was in the defendant's room, in his bed, wearing a shirt and no underwear, and the defendant was "touching all over [her] and stuff." When asked to specify where the defendant was touching her, the victim pointed to the vaginal area of a diagram, stated that she called it "a private part," and described how the defendant used his "boy part" to touch her private part. She confirmed that the term "boy part" was a reference to the defendant's penis. According to the victim, "it was just rubbing down there," on top of her private part, and she specifically denied that it had been inside of her private part. When asked how it felt, she stated that it felt weird. When asked about the rest of the defendant's body, she explained it was close to her, that she was on her side and the defendant was behind her. The victim further stated that she felt uncomfortable and dizzy.

After the defendant got dressed for work and left, the victim went to her sister's room and texted a friend from school who told her to call 911. The victim said that she first called her aunt, and then called 911 and told them she was raped. When asked what "raped" meant, the victim stated that rape was "what Mr. Smiley did" to her. She stated that she was shocked and that she did not understand why the defendant would do this to her.

The victim was subsequently interviewed on February 14, 2017, by Dr. Jamie Jackson of the Audrey Hepburn Care Center of the Children's Hospital. At that time the victim again made consistent detailed claims against the defendant,

4

specifically stating that the defendant had given her pills the night before the incident, when she woke up, she was only wearing a shirt,[5] the defendant's "boy parts" were "rubbing up against" her "girl parts," and that it lasted for "maybe about three minutes" before the defendant got up to go to work. However, at trial, the victim, who was then fifteen years old, identified the defendant in court as her sister's dad, but would not respond to other questions, such as whether she had been at the defendant's house or whether she remembered the last time she saw the defendant. When asked if there was anything she wanted to say, she stated, "Uhm ... the truth is that it wasn't him in that -- it was all my fault. And the only reason I ever called the police in the first place is because -- that I was scared I would get in trouble, and I didn't know that all of this would have happened, and I'm sorry, I guess." When asked why she thought it was her fault, she stated, "It's my fault because I said it was, and that's the truth, and that's all I'm going to say, so stop asking me questions." When asked if anyone told her what to say at trial, she stated, "No, and that's the truth. Okay, that's the truth. Is everyone listening, because I said it's the truth." The State tendered the victim for cross-examination, but the defense attorney declined to question the victim, and she was released from her subpoena.

Natasha Poe of the St. Tammany Parish Coroner's Office, accepted as an expert witness in DNA analysis, also testified at trial. Poe tested the contents of the victim's sexual assault kit, the green t-shirt, and a reference sample from the defendant. Chemical presumptive tests for the presence of semen performed on swabs of the victim's genitalia, perineum, inner thigh, the crotch of the victim's panties, and portions of the green t-shirt were all positive. During confirmation testing, spermatozoa were identified on the crotch of the victim's panties and on the back of the green t-shirt, confirming the presence of semen. The sperm

---

[5] The victim indicated that before falling asleep, she had put on pants (or pajamas).

5

fraction of one half of each anal swab produced a profile consistent with the defendant's DNA profile and a haplotype consistent with the defendant's haplotype.[6] The sperm fraction of one-half of each perineum swab produced a DNA profile consistent with the defendant's DNA profile and a haplotype consistent with the haplotype obtained from the swab of the defendant. A DNA profile foreign to the victim obtained from swabs from the victim's neck, ear, fingernails, as well as from the hip areas and crotch of the victim's panties, was consistent with the defendant's DNA profile. The swabs from the victim's fingernails, the epithelial and sperm fractions from the crotch of the victim's panties, and the hip areas of the victim's panties produced haplotypes consistent with the haplotype obtained from the swab of the defendant.

## ASSIGNMENT OF ERROR

In the sole assignment of error, the defendant asserts that jail calls admitted by the trial court were not relevant to his guilt or innocence. He further contends that the calls were used to make him look like a bad person with a temper, discredit the defense attorney, and reveal to the jury that he was incarcerated at the time of the trial. The defendant points out that in one of the calls, he is heard belittling the defense attorney after a disagreement. The defendant maintains that the State was allowed to use his conversations to accuse him of obstruction of justice for allegedly tampering with a witness (the alleged victim) although there was nothing dispositive in the calls to demonstrate obstruction or tampering. He notes that the State alleged that he and the other party to the calls spoke in "code" when they said things like "everything is everything" and "blocking." The defendant claims that

---

[6] A haplotype is the genetic constitution of an individual with respect to one member of a pair of allelic genes; or, in immunogenetics, that portion of the phenotype determined by a set of closely linked genes inherited from one parent (i.e., genes located on one of the pair of chromosomes). *Stedman's Medical Dictionary*, (2014). Poe testified, "a father will hand down the exact same Y haplotype to his son, which will then pass it down to his son. So you can't make a difference from a father and son's Y haplotype, because they're exactly the same." Regarding some of the samples for which she was able to make conclusions, Poe noted that the male DNA was consistent with the defendant or someone in his paternal lineage.

6

the State offered no evidence that he had any contact with the victim or that he directed anyone else to contact the victim. He suggests that his girlfriend, Kathy Hebert, the other party on the jail calls, and the victim both testified that they had no contact with one another during the pendency of the case.[7] Thus, the defendant urges that the jail calls were not probative but were highly prejudicial and likely contributed to the guilty verdict.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. La. C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. A trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. *State v. Freeman*, 2007-0470 (La. App. 1st Cir. 9/14/07), 970 So.2d 621, 625, writ denied, 2007-2129 (La. 3/14/08), 977 So.2d 930.

Under La. C.E. art. 404(B)(1), other crimes evidence "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident. La. C.E. art. 404(B)(1). Evidence of other crimes to prove knowledge, system, or intent is generally inadmissible when its relevance

---

[7] Although the victim denied that anyone told her what to say at trial, and Hebert denied any attempt to get the victim to change her story, notably, neither witness was directly asked if she had any conversations or contact with the other prior to trial.

is outweighed by its prejudicial effect. See La. C.E. art. 403; *State v. Graves*, 301 So.2d 864, 866 (La. 1974).

Nevertheless, evidence of a defendant's attempt to threaten, kill, intimidate, or dissuade a witness from testifying is a well-recognized exception to the general rule that evidence of other crimes is not admissible. See *State v. Burnette*, 353 So.2d 989, 991 (La. 1977); *State v. Williams*, 2014-1194 (La. App. 1st Cir. 3/6/15), 2015 WL 996231, at *7. Additionally, evidence of an attempt to influence witnesses or fabricate evidence is admissible despite its prejudicial effect. See *State v. Graves*, 301 So.2d at 866.

The Louisiana Supreme Court has addressed the issue of the admissibility of evidence where a defendant attempted to influence the testimony of witnesses, indicating that such evidence has substantial probative value in a proceeding designed to test the guilt or innocence of an accused. *Burnette*, 353 So.2d at 992. For this reason, the question of whether the evidence should be admitted has been almost universally answered in the affirmative. *Williams*, 2015 WL 996231 at *7.

Actions by a defendant that are designed to prevent witnesses from testifying give rise to an inference that he acted from a consciousness of his own guilt. *Burnette*, 353 So.2d at 992. Thus, such evidence is admissible and relevant to show consciousness of guilt on the defendant's part and his desire to evade prosecution. *State v. Lewis*, 2012-0803 (La. App. 4th Cir. 9/25/13), 125 So.3d 1252, 1263, writ denied, 2013-2537 (La. 6/20/14), 141 So.3d 279.

In determining the admissibility of evidence of other criminal acts of the accused, constituting admissions by conduct intended to obstruct justice or avoid punishment for the present crime, the trial court must decide, outside the jury's presence and in advance of the introduction of the evidence, whether (1) the evidence fits the class of evidence constituting such admissions by conduct; (2) there is substantial evidence that the defendant committed the other crimes; and (3)

8

the probative value of such other crimes evidence will outweigh its prejudicial effect. If the other crimes evidence fails to pass any of these three tests, it must be excluded. *Burnette*, 353 So.2d at 992.

In the instant case, the trial court held a hearing outside the presence of the jury to determine the admissibility of several jail calls that the State sought to introduce, occurring the month of the trial, which began on October 22, 2017. The series of calls specifically took place prior to the trial, between October 7, 2019 and October 20, 2019, and one or more additional calls took place on the night of the first day of the trial. The defense attorney objected to the admission of the jail calls contending that the jury would be made aware that the defendant was incarcerated at that time, the defendant would be subject to questions about the jail calls and/or obstruction of justice if he were to testify, and the calls were highly prejudicial. The State maintained that the jail calls showed an effort to coordinate either the lack of an appearance of the victim or to encourage the victim to tell a lie at the trial. The State asserted that the relevance of the jail calls became apparent when the district attorney's office attempted to meet with the victim before the trial. The victim's mother brought the victim to the office an hour and a half late, and there was a lack of cooperation at the time.

The trial court allowed the State to introduce those jail calls that had occurred prior to the start of the trial but ruled that those calls recorded on the night of the first day of trial, which had not yet been heard by the defense attorney, were inadmissible based upon the timing of the disclosure. A subsequent motion for mistrial based on the admission of the jail calls asserted by defense counsel was denied by the trial court.

The jail calls were played during the trial testimony of Christopher Johnson, an investigator for the district attorney's office. Johnson testified that after failed attempts at locating the victim's mother, he was first able to contact her on October

9

1, 2019, when he received a call back from her. He stated that the victim's mother was cooperative during their conversation and that a meeting was scheduled for October 7th. He noted, however, that when the victim and her mother arrived, the victim was "completely shut down." According to Johnson, the victim was looking at the floor the whole time, would not look at him, and would not answer salutations or greetings. Johnson recalled that the victim acted as if she did not want to be there and pointed out that the victim's mother seemed to play the role of the "authoritarian," answering questions that were directed at the victim.

Johnson confirmed that after the October 7th meeting, there was a period of a few days in which the district attorney's office again could not establish contact with the victim's mother to follow up. They ultimately went to the victim's grandmother's residence in Ponchatoula. Although the victim's mother initially came to the door, she quickly went back inside prior to returning outside to accept service of a subpoena. The victim's mother did not keep an arrangement for future contact and was non-responsive to subsequent messages.

On October 18th, the victim's mother contacted Johnson and agreed to bring the victim to the district attorney's office that day to prepare for trial. Arriving after the scheduled time, the victim's mother initially agreed to allow the assistant district attorney to prepare the victim for trial alone. The victim's mother subsequently sent text messages to Johnson expressing concerns about not being present during the victim's trial preparation. Johnson conferred with the assistant district attorney, who indicated that it would be fine for the victim's mother to be present. Before Johnson could communicate the information to her, the victim's mother became visibly upset and, as the assistant district attorney came out of the office with the victim, the victim's mother grabbed the victim's arm and left with the victim. They never returned to the district attorney's office.

Some of the jail calls took place before the victim and her mother arrived at the district attorney's office on October 7th. A female, identified as Hebert, began the first call by saying, "Si señor." The defendant can be then heard questioning her as to whether or not she had spoken to "dumb ass."[8] Hebert responded, "Yeah. He said ... he plans to call her after the meeting and then he's scheduling a meeting with them ... and then he said ... he's gonna find out what it was all about and what if or if anything they're trying to get her to testify for...." The defendant subsequently told Hebert to call his mother and tell her to call "dumb ass and see what the deal was." Hebert responded, "So she told her she'll be calling her as soon as she leaves ... and she said, um, the way she talkin' she don't care what they do." The defendant replied, "Yeah well, she tried that s*** and they forced her hand the last time." During subsequent jail calls, the defendant is heard asking Hebert if his mother had called "her" yet and repeatedly telling Hebert to call his mother and to tell his mother that he said to call "her."

At the outset of the fourth call, which presumably took place after the October 7th meeting, Hebert informed the defendant, "She say that um ... [inaudible] went with her but didn't say a word ... didn't say nothin' the whole time ... and uh they told her that they wantin' to put her on the you know and she said no, she's not doin' it, and uh, she said ... she ain't havin' it and she don't care... Yo momma said ... she told her they go try to f*** with her and s*** and she said she don't give a f***." The defendant replied, "Okay" and asked Hebert if she relayed the information to "dumb ass" yet. At the end of the call, the defendant told Hebert to talk to his mother again and "tell her to find out you know

---

[8] While it is unclear from the jail calls, Johnson testified that he assumed the defendant was speaking of the defense attorney in using the phrase "dumb ass." We further note that at trial Hebert confirmed that she was the other party on the jail calls that took place days before the trial, the defendant asked her to "make sure that everything is everything," and she and the defendant talked about the defendant's mother during the calls. Likewise, the defendant admitted at trial that he communicated with his mother through Hebert during the jail calls. However, neither provided any additional context for the jail calls.

11

if they you know tried to coerce her in any way." He added, "see what they talkin' about ... if they was talkin' about f****** with her then and find out how long were they up there for."

During subsequent jail calls, the defendant can be heard repeatedly telling Hebert to call his mother, complaining about the way things were being relayed, and asking whether or not "she" was being coerced, forced, or threatened. Specifically, at one point during a jail call, the defendant stated, "Right now that [expletive] just told y'all what she did, you need to be findin' out what the f*** she did and if she really did it, we ain't got nothin' to worry about." He later added, "Call that b**** ... see what's goin' on ... send that [expletive] to Kalamazoo if, if that's what it take." The defendant further stated, "Call my momma ... s*** ain't gettin' relayed the way it should, my momma ain't got f****** understanding as far as what need to be [expletive] said or not or asked ... s*** drivin' me crazy ... do the s***, make it happen, get the information." In a later call, at the outset Hebert abruptly stated, "Not going, not going, don't care what happens, not going." The defendant replied, "Oh, yeah?" Hebert told the defendant that his mother had just relayed that message to her. The defendant later asked if anyone had threatened "her" and Hebert replied in part, "No, told her [sic] they needed to" adding, "and we pretty sure it was ol' boy."

Considering the three-pronged analysis set forth by *Burnette*, we find that the jail calls were properly admitted. The content and timing of the jail calls seemingly indicate that the defendant was attempting to influence or have others influence initially what would happen during the victim's scheduled meeting with the assistant district attorney and subsequently as to whether or not the victim would continue to evade questioning and/or not appear at trial. The probative value of this evidence is substantial in that it was presented to explain the victim's recantation at trial of her consistent pretrial claims. Any prejudicial effect that

12

might have existed was substantially outweighed by this probative value. Mindful that the defendant has not provided any other plausible explanation or context for the content of the jail calls to the contrary, we conclude that the trial court did not err or abuse its discretion in admitting the jail calls to show consciousness of guilt on the defendant's part and his desire to evade prosecution. We find no merit in the sole assignment of error.

## DECREE

For these reasons, we affirm the conviction, habitual offender adjudication, and sentence of defendant-appellant, Jinel Sexton.

**CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE AFFIRMED.**